896 F.Supp. 1285 (1994)
UNITED STATES of America
v.
Daniel MILIKOWSKY and Macc Holding Corp.
No. 3:93CR-191.
United States District Court, D. Connecticut.
August 25, 1994.
*1286 Richard E. Byrne, Peter Levitas, Dwight Dickinson, U.S. Department of Justice, Antitrust Division, Washington, DC, for plaintiff.
Regina G. Malone, Steven A. Steinbach, Williams & Connolly, Washington, DC, David P. Atkins, Zeldes, Needle & Cooper, Bridgeport, CT, for defendants.

*1287 RULING ON DEFENDANTS' JOINT MOTIONS FOR A NEW TRIAL AND FOR ACQUITTAL

ELLEN B. BURNS, Senior District Judge.
On April 5, 1994, following an eleven-day trial, a jury of twelve found Defendants Daniel Milikowsky and MACC Holding Corporation each guilty of one count of conspiracy to fix prices of steel drums in the Eastern Region of the United States, in violation of 15 U.S.C. § 1, the Sherman Antitrust Act. Defendants now seek either a judgment of acquittal, based on the alleged insufficiency of the evidence, or, in the alternative, a new trial. For the reasons discussed below, the Defendants' motions for a judgment of acquittal and for a new trial are denied.

I. DISCUSSION

A. Motion for a New Trial

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a court "on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." In their memoranda supporting the pending motion for a new trial, the Defendants present several grounds upon which they believe this Court should find that "the interests of justice" mandate a new trial. In this ruling, the Court addresses each of those arguments, turning first to the Defendants' contention that there was a material and prejudicial variance between the proof adduced at trial and that alleged in the indictment.

1. Material Variance Between Indictment and Proof

In general, a variance "occurs when the charging terms of the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Attanasio, 870 F.2d 809, 817 (2d Cir.1989). A new trial is warranted only if the defendant is substantially prejudiced by such a variance between the indictment and the proof. United States v. Aracri, 968 F.2d 1512, 1519 (2d Cir.1992).
Defendants contend that such a prejudicial variance occurred at trial for two independent, but interrelated reasons. First, the Defendants argue that, by introducing evidence that the conspirators agreed to "threshold pricing"i.e. setting price levels below which no competitor would sell drumsthe government presented evidence of a conspiracy that differed significantly and substantively from the "general price increase" conspiracy alleged in the indictment. Second, the Defendants argue that, in light of the evidence regarding "threshold pricing," the government's proof, if believed, demonstrated the existence of two distinct and independent conspiracies, rather than the single conspiracy alleged in the indictment. After a careful review of the indictment and the evidence adduced at trial, the Court concludes that no variance occurred under either theory.

a. The Indictment

On July 15, 1993, a Philadelphia grand jury indicted Defendants Milikowsky and MACC, alleging that:
Beginning at least as early as May 1987, and continuing at least until April 1990, the exact dates being unknown to the Grand Jury, the defendants ... and co-conspirators entered into and engaged in a combination and conspiracy to fix prices of new steel drums offered for sale to customers in [certain] states ... (referred to in this indictment as the "Eastern Region"). The combination and conspiracy unreasonably restrained interstate trade and commerce in violation of Title 15, United States Code, Section 1, commonly known as the Sherman Antitrust Act.
The charged combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial term of which was to agree to fix prices of new steel drums offered for sale in the Eastern Region.
Notably, the charge itself is simple, alleging only a conspiracy to fix prices of steel drums; no specific allegation of general price increases or of "overt acts" is included. Such a stark statement of the offense is sanctioned by precedent establishing that, where the *1288 indicted crime is conspiracy to fix prices in violation of the Sherman Antitrust Act, the agreement itself constitutes the complete offense. Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913).[1]
The allegations of specific actions taken by the Defendants and their co-conspirators are found instead in the "Means and Methods" section of the indictment, in which the grand jury alleged that "for the purpose of forming and carrying out the charged conspiracy," the Defendants and their co-conspirators took numerous steps including: participating in meetings near the Newark and Chicago O'Hare airports "to discuss and agree upon the amount of general price increases for new steel drums"; discussing and agreeing upon the magnitude, dates of announcement, and dates of effectiveness of such general price increases; directing subordinates to issue the agreed-upon general price increase announcements and to coordinate with their "co-conspirator counterparts concerning the effective dates and specific price increases for new steel drums to be offered for sale to individual customers"; and meeting and contacting each other to "implement, monitor, police and conceal such agreements." (Indictment ¶ 8.) The indictment noted specifically that this list of alleged means and methods was not exhaustive. (Id.) ("[T]he defendants and co-conspirators did the following things among others ..." (emphasis added).)
As Defendants pointedly note, while the "Means and Methods" section refers numerous times to "general price increases," it does not mention the term or concept of "threshold prices." In order to determine whether the "threshold price" evidence introduced at trial created a material variance from the terms of the indictment, the Court now examines the threshold price evidence, within the context of the government's proof of the overall conspiracy.

b. Facts Adduced at Trial

At trial, the government introduced evidence implicating the involvement of four steel drum manufacturers in the Eastern Region of the United States: Russell-Stanley, Van Leer Containers, Eastern Steel Barrel, and Defendant MACC (known during the period of the indictment as "Mid Atlantic Container Corporation").[2] Central to the government's effort was the testimony of three alleged co-conspirators, each a former employee of one of the competing steel drum firms: William McEntee, former President of MACC; Robert Okra,[3] former Vice President for Sales at Eastern Steel Barrel; and Benjamin DeBerry, a former Vice President at Van Leer Containers.
Through the testimony of these three witnesses, the government established certain characteristics of the steel drum market; most importantly for this discussion, the government elicited testimony tending to show that the price of identical steel drums may vary from customer to customer on the basis not only of the particular specifications of the drums,[4] but also upon the bargaining power of the customer. (McEntee testimony, Tr. 92-3.) As a result, the general price increases announced by the steel drum competitors did not set new drum prices, but rather announced the dollar amount by which the price of each general type of drum would be increased on the effective date. (See Gov't Exhibits 4-9.)
To varying degrees, each of the three co-conspirator witnesses supported the indictment's allegation that the price increases announced by the four competitors during the indictment period were the result of collusion. First, William McEntee, former President *1289 of MACC, testified that each of the six price increases between May, 1987, and April, 1990, reflected competitor agreements regarding the amount, timing, and effective dates of those increases. McEntee described the process by which these six price increases came about, testifying that, when he and MACC Vice-President Herb Stickles became aware that the price of steel was going to increase, they would calculate what impact that increase would have upon their overall costs per drum. Based on those calculations, McEntee and Stickles would present a draft price increase announcement to Defendant Milikowsky, who possessed the final authority at MACC to order the price increases.
Thereafter, "[w]ithin a short period of time," Defendant Milikowsky would advise McEntee and Stickles as to how much MACC would increase its drum prices, the date upon which the price increases would take effect, and in what sequence, relative to its competitors, MACC's price increases would be announced. Occasionally the price ordered by the Defendant would vary slightly from the draft price presented to him by McEntee and Stickles. (Tr. at 114-16.) McEntee would subsequently cause the price announcement to be made, in accordance with the prearranged schedule.
According to McEntee, Defendant Milikowsky indicated to him, during occasional conversations about pricing,[5] that the price increases Milikowsky ultimately ordered were the "net result" of conversations with William Lima of the Russell-Stanley Corporation, and Benjamin DeBerry of Van Leer Corporation.[6] McEntee indicated that it was his understanding that these conversations among the three competitors occurred before, and in relation to, each price increase during the relevant period. (Tr. at 118-119.)
Benjamin DeBerry, former Vice President at Van Leerand the only government witness who testified that, while employed by a competing firm, he met and conspired with Defendant Milikowsky to fix pricesconfirmed that he engaged in such pricing conversations with Lima and Defendant Milikowsky, both by phone and in person, beginning in 1988. Through his testimony, DeBerry accounted for the latter four price increases that occurred during the indictment period.
Finally, Robert Okra, former corporate vice president for sales at Eastern Steel Barrel (ESB), confirmed the existence of concerted action in the price increases. First, Okra acknowledged in his testimony that the reason that the general price increases announced by all four competitors in May, 1987 were identical, was because "[t]hese were the levels we all agreed to hold above the threshold price." (Tr. 621.) He further testified that the competitors exchanged price increase announcements "to show us all that they [the competitors] were enforcing the increase. It gave us an effective date, gave us the incremental increase by gauge and capacity." (Tr. 647.)
Pursuant to the co-conspirator exception to the hearsay rule, Okra also testified that his superior, ESB President Andrew Campbell, was invited to and attended a price-fixing meeting at the Newark Airport Marriott.[7] According to Okra, Campbell told him that the meeting was attended by Stanley Bey, CEO of Russell-Stanley; Johan Bruil, President of Van Leer; and Ben Cake, President of Rheem Company. Okra recalled that Campbell had told him that Bill McEntee of MACC attended the meeting; Okra stated he did not know one way or the other as to whether Defendant Milikowsky attended the *1290 meeting.[8] (Tr. 609.) However, the government presented documentary evidence that Milikowsky, as well as several other competitors, did attend the meeting.[9]
In regard to contacts among competitors at the subordinate level, McEntee testified that, after each price increase announcement was issued, MACC would routinely receive calls from customers who reported that one of MACC's competitors had offered that customer a price increase that was smaller, or that would be effective later, than the increases as issued in the general price increase announcements.[10] On such occasions, McEntee or, more often, Herb Stickles, Vice President of MACC, would contact the counterpart from the relevant competitor firm Lou Gaev of Russell-Stanley, Vic Bergwall of Van Leer, or Robert Okra of Eastern Steel Barrelto verify the information about the account that had been provided by the customer. (Tr. 132-38.) If the competitor verified the information, MACC would meet the price increase or timing conditions offered by the competitor. (Tr. 141.) MACC would not undercut the conditions offered by the competitor, because "we didn't want to precipitate an overall decline in the price structure."[11] (Tr. 142.) McEntee asserted that MACC's competitors used a similar process to verify price and timing information about MACC accounts. (Tr. 142-43.)
Much of McEntee's testimony was corroborated by ESB's Okra who testified that both he and ESB President, Andy Campbell, had substantial "pricing contacts" with competitors. (Tr. 554.) Like McEntee, Okra's contacts were generally limited to the "executive level, not below vice president of sales." (Tr. 558). Those contacts included Herb Stickles and, on occasion, William McEntee from MACC, Vic Bergwall from Van Leer, and Lou Gaev from Russell-Stanley.[12] (Tr. 558-59, 563.) Okra echoed McEntee's testimony regarding the purpose and nature of his contacts with his counterparts; Okra explained that those contacts were intended "[t]o verify a price level and to verify increases." (Tr. 557.) In describing the contacts, Okra testified:
First there was the announcement, and you had thirty days to implement the incremental price increase from the time of the announcement to the effective date. The salesman would make the sales call to review the specific increase with the customer. The feedback would then come back to me. I would have contact to verify that increase with the competitors, Russell-Stanley, Van Leer and Mid Atlantic. ... in the sanitizing program, the step was to reconfirm what the competition was going to do; therefore, the phone calls were made to determine exactly what that price was.
(Tr. 640-41.)
As the Defendants note, although his description of the mechanics and purpose of the price verification calls was similar to that of *1291 McEntee, much of Okra's testimony did differ somewhat in that Okra repeatedly spoke of the agreements in terms of "threshold prices," a phrase that neither McEntee nor DeBerry employed when discussing the price increases or the verification calls. On numerous occasions, Okra characterized the subordinate officers' price verification contacts as efforts to maintain "threshold" or minimum prices below which ESB had agreed not to price its drums.
Okra testified that he first received a list of threshold prices in conjunction with the May 1987 price-fixing meeting at the Newark Airport Marriott, the purpose of which, Campbell had told him, was to "sanitize the selling price of steel drums," i.e. "[t]o set a level and stay at that level, not to go beneath it but to go above it when needed." (Tr. 605.) Okra testified that, before Campbell attended the meeting, Okra had requested that Campbell obtain from the competitors a "threshold price" list. (Tr. 568.) After the meeting, Campbell told Okra that he should expect a call from Herb Stickles. (Tr. 610.) Okra did receive such a call, in which Stickles provided specific "threshold prices" for 55-gallon drums by type and gauge. (Tr. 610.) Subsequently, according to Okra, Vic Bergwall called him and provided him with "threshold price" figures identical to those provided by Stickles.
As noted above, although much of his testimony concerned threshold prices, Okra also discussed general price increases; for instance, he testified that he spoke with Bergwall and Stickles about the July 1987 price increase. In connection with that increase, the government introduced into evidence a memorandum written from Okra to Campbell setting forth Okra's understanding of the "ground rules" for pricing that had been established during conversations with Stickles, Bergwall, and, occasionally, Gaev.
After several conversations trying to get a composite of what we had all agreed to, it was prudent for me to put this in writing, and ["ground rules"] one through four reflects [sic] exactly what those steps were regarding the program.
(Tr. 622.) Among those rules, Okra wrote and testified, was an agreement that certain accounts would be protected from the July 1987 price increase. Okra requested specific names for the accounts that were to be so protected:
[Stickles] said that we were going to increase our price where we could across the board, but we had certain areas that were protected, and I said, "Herb, this is likely threshold pricing. I'm in the dark and I need to know [which accounts] they are. We're going to step on each other's toes." With that combination of conversations with both [Stickles] and Vic Bergwall, I listed the ... accounts that are on that page ...
(Tr. 625.) Okra testified that the understandings memorialized in his "ground rules" memo resulted in continued pricing contacts between the competitors, and that Campbell was aware of, and approved of, these contacts. (Tr. 638-39.) He also stated that, to his knowledge, Andy Campbell continued to have pricing contacts with upper-level executives (i.e. John Bruil, Stanley Bey, William DeVlught of Van Leer, and Defendant Milikowsky) "from time to time." (Tr. 639-640.) Okra testified that his own pricing contacts with the lower-level executives continued through his departure from ESB in November, 1989.

c. Threshold Pricing as a Material Variance

The first of the Defendants' two arguments as to why the government's proof regarding threshold pricing mandates a new trial is that the "threshold" concept is at fundamental odds with the general price increase theory of the indictment:
The gravamen of the charges [in the indictment] was that defendants met or talked with competitors to discuss the amount, timing, and order of general price increases sent out to the purchasers of steel drums.
At trial, however, the government presented testimony from Robert [Okra] ... about a very different kind of conspiracy than the "price increase" conspiracy charged in the indictment. Instead, Mr. Okra testified that his superior at Eastern Steel Barrel, Andrew Campbell, had *1292 agreed with competitors (including Mid Atlantic) not to sell drums below a certain so-called "threshold price."
(Defs.' Mem. at 58 (emphasis in original).) As a result, Defendants contend, "the evidence offered at trial proved facts materially different from those in the indictment," such that "the defendants were unable to prepare a defense to such charges." (Defs.' Mem. at 60.)
The Defendants' premise their argument on the assumption that "[t]he `price increase' conspiracy announced in the indictment clearly entailed efforts to raise prices to certain target levels." (Defs.' Mem. at 59) (emphasis in original.) However, the language of the indictment does not warrant so narrow a reading. On its face, the indictment states only that the conspiracy to fix prices alleged in the charge paragraph was effectuated through numerous means and methods that entailed discussion about, agreement to, staggering of, and issuance of general price increase announcements. That the goal of the conspiracy was to raise the prices to "target levels" is merely speculation on the part of the Defendants.
Indeed, as numerous witnesses attested, the nature and structure of the steel drum industry would not easily accommodate "target" pricing levels. As noted above, because of variations in customer needs, relationships, and buying power, one steel drum company might sell identical drums to two different customers at two different prices. The indictment does not allegeand the government was not required to provethat the goal of the conspiracy was to eliminate these differentials in order to arrive at a single higher price for each type of drum. Rather, the indictment alleges that the competitors sought to standardize the timing and magnitude of price increases and thatin order to give lasting and substantial effect to those increasesthe lower-level executives of the competing companies "coordinate[d] with their co-conspirator counterparts concerning the effective dates and specific price increases for new steel drums to be offered for sale to individual customers[.]" (Indictment ¶ 8(f).)
The proof at trial was consistent with those allegations. First, as documented above, the government produced substantial evidence that the upper-level executives met to decide the timing, amount, and effective dates of general price increases. Second, the allegations of the indictment regarding coordination among the co-conspirator subordinates were substantiated by the testimony of both McEntee and Okra as to their price verification calls.
The evidence adduced at trial indicated that the effectiveness of the price fixing and increases depended heavily on these coordinated efforts by the subordinates to verify prices on specific accounts. Understanding that the price increases could not be implemented uniformly as to every customer, the competitors sought to verify prices as to certain accounts where the increases might not be enforced according to the general announcements. McEntee testified that, by way of the price verification calls, the competitors would meetand not betterthe specific terms of their competitors' offers, so as not to "precipitate an overall decline in the price structure." (Tr. 142.) Okra's testimony that the conspirators intended to place a floor on price concessions to certain customers, although couched in different terms, corroborates the substance of McEntee's testimony. Similarly, Okra's "ground rules" memo is evidence of the subordinates' efforts to coordinate prices and price increases on particular accounts.
That Okra and ESB understood there to be certain threshold prices below which they were not to allow their individual accounts to fall does not alter the fact that the general price increases alleged in the indictment were an integral part of the price-fixing conspiracy. Indeed, if the "threshold price" evidence represents anything more than a deviation in semantics, it merely constitutes an additional "means and method" by which at least some of the conspirators sought to fix prices and effectuate as fully as possible the general price increases announced as a product of collusion.
The Supreme Court has noted that "[a] variation between the means charged and the means utilized is not fatal. And where an *1293 indictment charges various means by which the conspiracy is effectuated, not all of them need to be proven." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 250, 60 S.Ct. 811, 856, 84 L.Ed. 1129 (1940). Likewise, there is no variance where, as here, the government simply proved a means that was not listed in the indictment. United States v. United States Gypsum Co., 600 F.2d 414, 419 (3d Cir.) ("Nor is the Government limited in its proof to these overt acts alleged in the indictment.") cert. denied, 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979). Thus, the government's failure to allege threshold pricing as a separate means and method in the indictment is not fatal.
In sum, Robert Okra's testimony regarding threshold prices was wholly consistent with the indictment's allegations regarding the general price increases and the coordinated implementation of those increases at specific accounts. As such, the fact that Okra referred to part of the mechanism of coordinated implementation as "threshold prices" does not betoken a variance from the indictment.

d. Threshold Pricing as Evidence of Multiple Conspiracies

As a second theory of variance, the Defendants argue that "[r]ather than showing a seamless conspiracy to fix six price increases from May 1987 through April 1990 ... the testimony at trial, if believed, suggested the existence of two (or more) separate conspiracies." (Defs.' Mem. at 66.) As support for this contention, the Defendants observe that Benjamin DeBerry testified to his participation in only four price increases; that Eastern Steel Barrel was not directly involved at the upper-executive level in the four price increases allegedly agreed to amongst DeBerry, Lima and Defendant Milikowsky; that McEntee testified incorrectly that DeBerry had been involved in all six increases; and that Okra's testimony regarding the first two price increases were part of a separate "threshold pricing" conspiracy, involving entirely different personnel than the conspiracy resulting in the last four price increases. These disparate pieces of evidence, the Defendants conclude, cannot be reconciled with the single conspiracy alleged in the indictment.
To prevail in their argument that the government proved multiple conspiracies, rather than the single conspiracy alleged in the indictment, the Defendants must meet a particularly high standard. Generally, whether the proof at trial proved multiple conspiracies or the single conspiracy charged in an indictment is an issue of fact for the jury. United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir.1990) ("where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury.") cert. denied, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991).
In the instant case, the Court gave a "multiple conspiracies" charge, explaining to the jury that:
In this case, the Defendants contend that the Government's proof fails to show the existence of the conspiracy that was alleged in the indictment. If you find that the conspiracy charged in the indictment did not exist, or if you find the existence of a conspiracy that is substantively different than the conspiracy alleged in the indictment, you cannot find either Defendant guilty of the single conspiracy charged in the indictment.
Similarly, proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in the indictment, unless one of the conspiracies proved happens to be the single conspiracy described in the indictment.
(Tr. 2321-22.) The Defendants do not argue that the jury instructions were improper, but instead contend that the Court may order a new trial because the evidence adduced at trial is insufficient to support the jury's finding of a single conspiracy. Thus, given that the jury was properly instructed as to the possibility of multiple conspiracies, the relevant issue is "whether the evidence supports a finding that the alleged conspiracy was proved[.]" United States v. Alessi, 638 F.2d 466, 473 (2d Cir.1980).
*1294 Notably, the proof necessary to sustain the jury's finding of a single conspiracy is not overwhelming:
`in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.' ... The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the nature of the plan.... The goals of all the participants need not be congruent so long as their goals are not at cross-purposes.... Nor do lapses of time, changes in membership, or shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies.
Maldonado-Rivera, 922 F.2d at 963 (citations omitted).
In light of this precedent, and notwithstanding the Defendants' inventory of alleged discrepancies between the "threshold" and "general price increase" conspiracies, the Court finds that the Defendants have failed to meet their high burden of showing that no reasonable jury could have believed that the government proved the existence of the single conspiracy alleged in the indictment. That is, the Court finds that the government adduced sufficient evidence at trial to link the first two and last four general increase announcements.
First, the government produced evidence that, if believed, indicated that Defendant Milikowsky participated in at least three price-fixing meetings with other steel drum competitors, including one meeting as early as May, 1987. Moreover, William McEntee testified that, on six occasions during the indictment period, Defendant Milikowsky provided him and Herb Stickles with price increase levels and effective dates identical to those issued by competitors, and that, after each price announcement, he and his competitor counterparts, including Robert Okra, engaged in the process of price verification, as alleged in the indictment.[13] On the basis of this evidence, a reasonable jury could infer that the Defendants "agreed to participate in what [they] knew to be a collective venture directed toward a common goal[,]" id., i.e., the goal of fixing prices in the steel drum industry, through the mechanism of coordinated general price increase announcements, and the attempted enforcement thereof.
In short, the Court cannot find as a matter of law that the government has failed to demonstrate the requisite concert of action and intent that Second Circuit precedent has established as the touchstone of a single conspiracy.[14]Id. As such, the Court must let stand the jury's implicit finding that the single conspiracy alleged in the indictment existed.

2. Prosecutorial Misconduct

a. Contentions

As a second basis for a new trial, the Defendants contend that the government failed to correct, and, indeed, capitalized upon, certain "false" testimony by Benjamin DeBerry regarding when he was first able to identify the location and date of a particular alleged price-fixing meeting with William *1295 Lima and Defendant Milikowsky. The Defendants' claim is predicated on a letter provided to them by the prosecutors, pursuant to the government's Brady obligations. That letter stated that:
In an interview with government counsel on May 10, 1990, Benjamin DeBerry indicated that he had attended two price-fixing meetings with Daniel Milikowsky and William Lima, one of which occurred at the Newark Airport Marriott. He was unsure of the location of the other meeting.... In an interview with government counsel on April 1, 1993, DeBerry reiterated that one of the price-fixing meetings took place at the Newark Airport Marriott but his best recollection at that time was that the other price-fixing meeting occurred at the O'Hare Hilton outside of Chicago.
(Defs.' Mem., Attachment 4.) Later, in another Brady disclosure, the government informed the Defendants that DeBerry did not identify the date of the Chicago meeting until February 23, 1994, and that he identified that date with the assistance of certain government exhibits. (Defs.' Mem., Attachment 6.)
Believing that DeBerry's three-year delay in recalling the location of the second price-fixing meeting was highly exculpatory, the Defendants sought to introduce evidence of that delay to the jury. During lengthy cross-examination, defense counsel questioned DeBerry about when he had originally informed the government that the second meeting had taken place in Chicago. DeBerry's initial response was that he was unable to recall whether he had conveyed that fact to the government in his first interview with them.[15] Subsequently, DeBerry stated numerous times that he did not recall when he first told the prosecutors the location and date of the Chicago meeting. (Tr. 1749, 1750, 1766, 1768, 1769, 1771, 1772, 1774, 1794, 1797.) Although the Defendants were given the opportunity to refresh DeBerry's recollection by showing him the Brady letter, the document did not give the witness an independent recollection of when he told prosecutors about the Chicago meeting. (Tr. 1765-68, 1773-74.)
Interspersed with DeBerry's statements that he was not able to recall when he identified Chicago as the location of the second meeting, DeBerry asserted a number of times that he "believed" or that it was his "best recollection" that he told the prosecutors of the location during one of his 1990 interviews with the government. (Tr. 1768, 1769, 1770, 1772, 1878.) Defense counsel were able to impeach these misstatements to a significant extent with DeBerry's previous grand jury testimony: first, his October 1990 grand jury testimony, in which he stated that he did not recall whether he met Defendant Milikowsky at the Chicago O'Hare Hilton, even after being presented with his own records indicating that location;[16] and, second, his January 1991 grand jury testimony in which he stated that he could not remember the location of his second meeting with Defendant Milikowsky and William Lima. (Tr. 1806-07.)
In order to impeach DeBerry further with additional extrinsic evidence, defense counsel sought to introduce the Brady letter as an admission of a party opponent, and also requested, alternatively, that the government stipulate to the facts incorporated in the Brady letter. This Court denied the former request, and did not order compliance with the second.
On redirect, the government asked DeBerry a series of questions regarding what he told prosecutors during his interviews and *1296 during his grand jury appearances as to how many face-to-face meetings he had had with Defendant Milikowsky and Lima, and what they discussed at each of those meetings. DeBerry responded that he had consistently told the government that there were two meetings, and that the magnitude, effective dates, and order of announcement of general price increases had been the subject of the meetings. The government did not elicit from DeBerry any testimony regarding when he first told the government about the Chicago location.
After DeBerry's testimony, the issue was raised a final time during the prosecutor's closing remarks. At that time, the prosecutor described to the jury how DeBerry's testimony was independently corroborated by evidence of which DeBerry was not aware at the time of his first interview with the government:
[H]ow is it that when Mr. DeBerry first came to the government, in May of 1990, he didn't know what this phone analysis would show? He didn't know that there would be spikes [in the government's summary charts regarding phone activity among the competitors] in all the right months, at the times he said there was increased phone activity. He didn't know that Russell-Stanley had bought zero steel out of the $50 million for 1988. He didn't know that Mr. Milikowsky's 1988 calendar would say "Chicago lunch with Bill and Ben." He didn't know that Mr. Lima had made a phone call from the United Airlines terminal at O'Hare Airport that very afternoon. ... Mr. DeBerry didn't have any of this testimony. He didn't have any of this information. He didn't have any of this documentary evidence.
(Tr. 2060 (emphasis added).)

b. Discussion

Defendants now contend that a new trial is warranted because the prosecutors failed to correct DeBerry's "false" statements that he believed that he had told prosecutors in May, 1990, that the second price-fixing meeting occurred in Chicago. They contend that, by remaining silent when they knew that DeBerry had spoken incorrectly, the prosecutors impermissibly relied on incorrect testimony, and that, as a result, the jury was left with the false impression that DeBerry had been consistent about the location and date of the Chicago Hilton meeting since his first meeting with prosecutors. Finally, Defendants argue that the government compounded its misdeed by implying during closing argument that, during his May 1990 interview with prosecutors, DeBerry provided information that was later independently corroborated by certain MACC receipts and records indicating that Milikowsky took a trip to the Chicago O'Hare Airport.
As Defendants correctly argue, "it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment ... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The Second Circuit has articulated a three-part standard for determining whether a new trial is warranted because of a prosecutor's knowing use of false testimony:
that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).
United States v. Helmsley, 985 F.2d 1202, 1205-06 (2d Cir.1993).[17]See also Giglio v. *1297 United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.") (quoting Napue, 360 U.S. at 271, 79 S.Ct. at 1178).
In applying this test, the Court must first determine whether DeBerry's testimony was "false." In this regard, the Defendants imply that DeBerry's answers to defense counsel's lengthy cross-examination should be considered as two separate categories: those in which he stated he was unable to recall when he identified the location of the meeting, and those in which he stated his belief that he told the prosecutors of the location in 1990.
The Court disagrees. For purposes of determining whether the prosecutors were constitutionally required to correct DeBerry's testimony, the Court believes that DeBerry's testimony on the issue of when he informed the prosecutors of the Chicago meeting  testimony that spans fifty pages of transcript  should be considered as a whole.[18]See, e.g., Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir.1987) (reviewing "entire record" in determining whether "trial testimony ... can be characterized as false at all."). The Court believes that the record should be reviewed in its entirety, rather than on an answer-by-answer basis for two reasons; first, because the Court must consider the testimony in the same manner and in the same context as did the jury; and second, because the Court must consider for purposes of the second prong of the Helmsley test, whether the testimony, when viewed in context, should have been recognized by the government as false.
Viewing the testimony as a whole in this manner, the Court concludes that the testimony is not "false" for purposes of determining whether the government had a duty to "correct." First, DeBerry stated at least fourteen times that he could not recall when he gave the government the information in question.[19] Even in conjunction with the numerous times that he asserted that he "believed" that he told the government in 1990, the overall impact of DeBerry's equivocations was that he did not know when he told the government; on each occasion when DeBerry asserted that he had told the government of the Chicago meeting in 1990, he prefaced his answers with such phrases as "I believe," "I think," and "to the best of my recollection."[20] As such, these "inaccurate" *1298 statements were not so clearly "false" as to place upon the prosecutors a duty to correct.
In the absence of any evidence to the contrary, the Court presumes that DeBerry indeed answered these inquiries to the best of his ability.[21] Thus, even were it definitively demonstrated that the information DeBerry provided in those answers was incorrect, the Court has no reason to believe that his testimony was knowingly false, or, more importantly, that he testified inaccurately as to his state of mind. The Court therefore does not consider DeBerry's statements to have been "false."
This view that erroneous testimony does not always constitute "false" testimony finds support in Mills, 826 F.2d at 1195. In that case, a habeas petitioner sought to set aside his murder conviction on the basis that the prosecution failed to correct a witness' incorrect testimony that she had not appeared before a grand jury. The witness had testified, however, that a statement had been taken by a District Attorney on the date that coincided with her actual grand jury testimony. The court held that
a review of the entire record here raises a question as to whether the trial testimony of Tracy Gist can be characterized as false evidence at all.... As any layperson might, she may have misunderstood the nature of the grand jury proceedings in which she took part. Her testimony at trial, if understood in that light, could not be considered misleading, and there would therefore be no obligation on the part of the prosecutors to "correct" it.
Id. at 1195.[22]
Had DeBerry stated unequivocally that he knew he told prosecutors about the Chicago meeting in 1990, the Court might find that the statement was "false" for purposes of a prosecutorial misconduct analysis  even had the statement been an honest misapprehension *1299 by the witness.[23] However, DeBerry made no such claim. Rather, he made equivocal and qualified statements that, the Court assumes, honestly reflected his inability to recollect.
Defendants contend that such a lack of intent to testify falsely is immaterial; they cite United States v. Glover, 588 F.2d 876, 879 (2d Cir.1978), for the proposition that "even if [the] testimony were not perjurious, but simply mistaken ... the government still would have a duty under the Fourteenth Amendment not knowingly to allow false testimony to go uncorrected." In Glover, the false testimony in question was that of a defense witness, Hardy, who testified that the defendant had introduced him to a potential supplier of heroin at a time when, it was later acknowledged by the government, Hardy was incarcerated.[24]
The Defendants' comparison of this case to Glover underscores a fundamental difference between DeBerry's allegedly "false" statements and those in cases where prosecutorial misconduct was found to have occurred. The quality and gravity of the "false" statements at issue in this case simply cannot be equated with that in Glover or those in the other cases cited by the Defendants. See, e.g. Giglio, 405 U.S. at 151-52, 92 S.Ct. at 764-65 (witness falsely denied that he had no deal with the government in exchange for testimony); Napue, 360 U.S. at 267-69, 79 S.Ct. at 1176-77 (same); United States v. Wallach, 935 F.2d 445, 455-57 (2d Cir.1991) (witness lied on stand about whether he continued to gamble); Annunziato v. Manson, 566 F.2d 410, 413-14 (2d Cir.1977) (witness testified falsely that he had no deal concerning pending charges). In each of these cases, the false testimony was about a substantive fact in the case involving either inculpatory evidence (Glover), the potential bias of a witness (Giglio, Napue, Annunziato), or the witness' willingness to lie on the stand (Wallach). In the instant case, the falsity is completely self-referentialthe alleged falsehood goes not to whether the Chicago meeting took place, nor even to whether DeBerry ever told the government about the location of the second meeting, but instead about how and when the witness told prosecutors of that fact. Under these circumstances, where the fact in issue is the reliability and credibility of a witness' recollection, the Court finds that there is no "falsity" for purposes of a prosecutorial misconduct analysis, where a witness asserts an honest, albeit incorrect, belief as to when he told prosecutors of a particular fact.
Having found no falsity, the Court also finds that the prosecutors were under no duty to "correct" DeBerry's testimony, even though their recollection of DeBerry's revelation of the Chicago meeting differed from DeBerry's recollection.[25] As noted above, DeBerry's equivocation and wavering between inability to recall and tentative assertion that he told the government in 1990 tended to prove the Defendants' assertion about the reliability of DeBerry's account. Moreover, the Defendants' use of impeaching grand jury testimony tended to prove the inaccuracy of DeBerry's statements. As such the government reasonably could have concluded, as has this Court, that DeBerry's testimony was not "false."
Were DeBerry's testimony the only context in which the issue of DeBerry's consistency on the Chicago meeting was raised, the Court's holding that the government was reasonable to believe that there was no false testimony would be dispositive. However, the government resurrected the arguably inaccurate testimony during its summation, in which the prosecutor impliedintentionally *1300 or otherwise  that "when Mr. DeBerry first came to the government in May, 1990," he provided information about the Chicago meeting that was later corroborated by documentary evidence. Defendants argue that, through this comment, "[r]ather than distanc[ing] themselves from Mr. DeBerry's false testimony, the prosecutors embraced and exploited it."[26] (Defs.' Mem. at 29.)
Although it believes, for reasons other than those asserted by the Defendants, that the prosecutor's remarks constituted error (albeit harmless),[27] this Court  having already determined that DeBerry's testimony was not "false"  cannot agree with the Defendants' claim that the prosecutor's remarks "embraced and exploited" false testimony. Consequently, the precedent cited by the Defendants for the proposition that "a closing argument that improperly relies on false testimony cannot be countenanced[,]" (Defs.' Mem. at 30), is inapposite to the facts of this case.[28]
Defendants may argue that the prosecutor's remarks served to strengthen and capitalize upon DeBerry's arguably incorrect testimony, so as to make that testimony effectively "false." Even assuming that such is the case, the Defendants must overcome the final hurdle in the analysis of prosecutorial misconduct; whether there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Helmsley, 985 F.2d at 1205-06. Thus, the Defendants will prevail only if it is "reasonably likely" that they would have been acquitted had the jury been informed that  contrary to the implication of the prosecutor's closing argument  DeBerry first identified the location of the Chicago meeting in April, 1993.
Based on a review of the record, this Court does not believe it "reasonably likely" that the jury would have acquitted had it been so informed; that is, the prosecutor's improper remarks  as well as DeBerry's underlying inaccurate statements, had they been considered "false"  constituted only harmless error. First, contrary to the Defendants' contention that "Mr. DeBerry was permitted to *1301 create the misleading impression that he had given a consistent story about the Chicago O'Hare meeting from the outset of his cooperation with the government[,]" (Defs.' Mem. at 9), the jury was exposed to significant evidence that DeBerry was unable to identify the location of the second meeting at such critical times as his 1990 and 1991 grand jury testimony. Indeed, the Court's review of DeBerry's testimony indicates that the overall impression remaining at the conclusion of his testimony was that DeBerry had been far from consistent on the issue of when he provided the prosecutors with the date and location of the second meeting with Lima and Defendant Milikowsky. To the extent that the prosecutor's closing remarks contradicted that impression, the Court cured any possible error with its admonition in its jury charge that counsels' arguments are not evidence, and that the jurors should rely solely on their independent recollection of the facts when arriving at their verdict.
Moreover, the prosecutor's error did not prejudice the Defendants insofar as DeBerry's testimony regarding the date and location of the Chicago meeting  even as mischaracterized by the government  was only one of many pieces of evidence tending to prove that DeBerry, Lima, and Defendant Milikowsky met on November 9, 1988 at the Chicago O'Hare Hilton.[29] The government also presented documentary evidence of the existence, location, and timing of that meeting, including: DeBerry's expense report for the Chicago trip; Lima's telephone charge card billing records indicating a credit card call from a pay phone in O'Hare Airport on November 9, 1988; an entry in Defendant Milikowsky's calendar for the date of November 9, 1988, stating, in his own handwriting, "Chicago Lunch with Bill and Ben"; Milikowsky's hotel bill from the O'Hare Hilton for the same date; and a petty cash receipt from the files of Jordan International indicating a $200 withdrawal by Defendant Milikowsky the day before the alleged meeting for a "trip to Chicago." Considering such documentary evidence, as well as the cross-examination of DeBerry on the issue,[30] the Court cannot find that it is "reasonably likely" that the jury would have acquitted absent the government's isolated remark implying that DeBerry told prosecutors about the location of the Chicago meeting in his first interview.[31] For these reasons, the Defendants' motion for a new trial on the basis of prosecutorial misconduct is denied.

3. Insufficient Opportunity to Cross-Examine DeBerry

As their third basis for a new trial, the Defendants argue that their rights under the Sixth Amendment's Confrontation Clause were violated by impermissible restrictions on their cross-examination of Benjamin DeBerry; specifically, the Defendants contend that, despite the government's disclosure in the Brady letter about DeBerry's failure to remember during his interviews with prosecutors *1302 the dates and locations of certain price-fixing meetings, they were improperly prevented from using that information to impeach DeBerry's assertion on direct examination that he met with Defendant Milikowsky and William Lima on November 9, 1988, at the Chicago O'Hare Hilton, and that he met on an unspecified date with them at the Newark Airport Marriott. See United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977) ("The Defendant gains nothing, however, by knowing [about impeachment information] unless he is able to impart that knowledge to the jury."). Because the existence, dates, and locations of the price-fixing meetings are not collateral issues, Defendants contend, they should have been allowed to use extrinsic evidence  i.e. the Brady letter, the testimony of the prosecutors who were present at the relevant interviews, or a stipulation as to the contents of the Brady disclosures  to impeach DeBerry's testimony.
Defendants are correct, of course, that "[a] party may always attack the credibility of an adverse witness by showing that [he] has made statements which are inconsistent with some material part of his testimony." United States v. Jordano, 521 F.2d 695, 697-98 (2d Cir.1975). However, Defendants' argument  i.e. that a new trial is warranted because they were prevented from introducing extrinsic evidence about the prosecutors' recollection of DeBerry's interviews  is flawed for three reasons: first, DeBerry's testimony regarding the dates and locations of the price-fixing meetings was not "inconsistent" for purposes of a Confrontation Clause analysis; second, the Defendants were able to place before the jury sufficient facts and testimony to allow the jury to make an informed decision as to the credibility of DeBerry both generally and specifically on the issue of the Chicago meeting; and, third, any possible error in this regard was harmless.
In seeking to impeach DeBerry with his failure to recall certain facts during his interviews with prosecutors, Defendants argue that, in such cases as United States v. Carr, 584 F.2d 612 (2d Cir.1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), and United States v. Leonardi, 623 F.2d 746, 756 (2d Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980), the Second Circuit has recognized that a statement need not directly contradict a prior statement in order to be considered "inconsistent"; rather, they argue, "[i]nconsistency may be found in silence, lack of memory, evasive answers, and changes in positions." (Defs.' Mem. at 36.) In Leonardi, the Second Circuit did indeed declare that "under certain circumstances" silence may be used to impeach; however, a close reading of that case bolsters the government's contention that the Defendants cross-examination of DeBerry was constitutionally sufficient.
In Leonardi, the defendant claimed on appeal that his cross-examination of a government witness, Ax, was improperly curtailed because the defendant was prohibited from introducing as a prior inconsistent statement an FBI agent's summary report of his interview with Ax; because that report did not contain certain inculpatory facts to which Ax testified at trial, the defendant sought to impeach the witness with his previous "silence." The Court held that:
The FBI agent's memorandum was correctly excluded since it was not inconsistent with the witness' trial testimony, nor could it properly be attributed to Ax for impeachment purposes. Under certain circumstances prior silence concerning critical facts might be deemed inconsistent with later testimony which includes their purported recollection. However, for this to be the case, the failure to mention those matters must conflict with that which is later recalled. Where the belatedly recollected facts merely augment that which was originally described, the prior silence is often simply too ambiguous to have any probative force, United States v. Hale, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136-37, 45 L.Ed.2d 99 (1975), and accordingly is not sufficiently inconsistent to be admitted for purposes of impeachment.
Id. The Court finds that, like the witness in Leonardi, DeBerry did not contradict prior testimony by later adding details about the date and location of his second meeting with Defendant Milikowsky and William Lima. *1303 Rather his "belated recollections" merely augmented his previous statements to prosecutors.[32] Thus, for purposes of the Confrontation Clause, DeBerry's testimony at trial that he attended a meeting in Chicago on November 9, 1988 is not inconsistent with his alleged prior statements.[33]
The Leonardi court's admonition that prior silence is often too ambiguous to be particularly probative is of particular import in this case. While the government's Brady letter asserts that DeBerry did not tell the prosecutors of the location of the second meeting until April, 1993, the letter does not reveal the manner in which, or the depth with which, prosecutors questioned him on this subject during his first interviews. Neither does the disclosure state whether prosecutors used any documents to try to refresh DeBerry's recollection during those interviews. In addition, the Brady letters reflect only the prosecutors' unsworn recollection of the interviews with DeBerry. For these reasons, as Leonardi warns, the extrinsic evidence requested by the Defendants  whether that evidence be a stipulation, the prosecutors' testimony, or the Brady letter itself[34]  is significantly more ambiguous and less probative than the Defendants acknowledge. As such, it was well within the discretion of the *1304 Court to prohibit the introduction of that evidence.[35]Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."); Carr, 584 F.2d at 617 ("Although defense counsel is entitled to reasonably wide latitude in testing a witness' credibility by cross-examination ... the trial judge is also entitled to exercise sound discretion in determining the scope of such cross-examination in a specific case.") (citations omitted).
Moreover, even assuming, arguendo, that the statements were "inconsistent" for purposes of a Confrontation Clause analysis, the Defendants' inability to introduce extrinsic evidence to "prove up" the inconsistencies would not constitute a violation of the Defendants' Sixth Amendment rights, so long as "the jury [was] in possession of facts sufficient to make a `discriminating appraisal' of the particular witness's credibility." United States v. Roldan-Zapata, 916 F.2d 795, 806 (2d Cir.1990) (citation omitted), cert. denied, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). See also Carr, 584 F.2d at 617 (cross-examination is not improperly curtailed if "'the total cross-examination was sufficient to afford the jury a basis to evaluate the defense theory.'") (quoting United States v. Ong, 541 F.2d 331, 342 (2d Cir. 1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977)).
As discussed more fully above, Defendants in the instant case were allowed to present to the jury sufficient evidence with which to assess the credibility of DeBerry's testimony, particularly in regard to the consistency of his recollection about the Chicago meeting. Having introduced DeBerry's statements during two appearances before the grand jury that he "couldn't recall whether he met [in Chicago] or not," (Tr. 1770-71), Defendants were given a constitutionally sufficient opportunity to confront and impeach DeBerry before the jury. See Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (criminal defendants are entitled only to "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (emphasis in original).
Finally, even had the Defendants been denied improperly the right to confront DeBerry on the issue of his recollections of the Chicago meeting, their request for a new trial would be assessed under a harmless error standard. Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436 ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."). This Court has already determined in the context of Defendants' motion for a new trial on the basis of prosecutorial misconduct that it was not "reasonably likely" that the jury would have acquitted the Defendants had the jurors known that DeBerry did not inform the government of the Chicago location until April, 1993. For the same reasons discussed above, supra at 1300-1301, the Court finds as harmless beyond a reasonable doubt any potential error resulting from the denial of Defendants' request to use extrinsic evidence to impeach DeBerry in regard to his recollections of the Chicago meeting.
In sum, DeBerry's testimony was not "inconsistent" with his earlier interviews with the government, the Defendants were able to present to the jury sufficient evidence upon which they could base their assessment of DeBerry's credibility on this issue, and any possible error was harmless. Therefore, the Defendants' request for a new trial on the basis of an alleged violation of the Confrontation Clause is denied.

*1305 4. Evidentiary Hearing Regarding Possible Perjury

In their fourth challenge to their convictions, Defendants focus on two other subjects of Benjamin DeBerry's testimony: first, his alleged conversation with Defendant Milikowsky during which the two agreed to cover-up their price-fixing activities by telling prosecutors that all their conversations and meetings had been about steel purchases; and, second, DeBerry's assertion that the subject of the November 9, 1988 Chicago O'Hare meeting was price-fixing. Defendants contend that "[t]here is good reason to suspect that ... Mr. DeBerry may have perjured himself" in regard to these topics, because his "testimony in this case was fundamentally inconsistent with prior testimony given under oath." (Defs.' Mem. at 46.) Recognizing that the facts, as currently developed, have not established that DeBerry committed perjury or that the government knew or should have known that DeBerry's statements constituted perjury, the Defendants do not yet seek a new trial on this issue; rather, they seek an evidentiary hearing "to determine whether Mr. DeBerry gave knowingly false testimony at the trial, and, thus, whether defendants are entitled to a new trial on that basis." Such a hearing would also serve to determine whether the prosecutors knew or should have known about the alleged perjury. (Defs.' Mem. at 52.)

a. Facts

On direct examination, DeBerry testified that, in a telephone conversation after the grand jury's investigation into the steel drum industry first became public, "Mr. Milikowsky and I agreed that if there were to be any discussions or investigation of the communications that we had on a frequent basis ... that the justification that we would use would be the fact that I purchased steel from Jordan International." (Tr. 1476-77.) Defendants contend that this statement directly contradicts his October 3, 1990, statement before a grand jury that, after he received a subpoena for Van Leer documents, he did not have any conversations with any competitors concerning the subpoena or the steel drum investigation. (Defs.' Mem., Attachment 10 at 110-111.)
Defendants' claim of potential perjury in regard to the Chicago meeting involves DeBerry's testimony during direct examination that he met with William Lima and Defendant Milikowsky in November, 1988. This statement, Defendants claim, cannot be reconciled with his prior sworn testimony in the 1992 price-fixing trial of Johan Bruil and other steel drum competitors in the Midwest Region of the country. In the Bruil trial, DeBerry explained that he did not attend a price-fixing meeting in December, 1988, because he was uncomfortable with the idea of meeting with a number of competitors at once:
My communications with competitors up until that point had essentially been one on one ... I had never attended any meetings where there were multiple competitors sitting down at a table, and I was very, very uncomfortable with that.
(Defs.' Mem., Attachment 11 at 1413.) Thus, Defendants argue, if DeBerry's Bruil testimony is believed, then the alleged November 1988 meeting with two other competitors (Lima and Milikowsky) could not have occurred. On the other hand, if his testimony in the instant case is credited, he perjured himself in the Bruil trial, because he had, in fact, attended a price-fixing meeting with multiple competitors.
On redirect, DeBerry offered an explanation by which these two sworn statements could be reconciled:
I knew Mr. Milikowsky and I knew Bill Lima, for a good time frame. I had developed a relationship with those two individuals. I felt that in the other situation of the Ohio competitors, the six Ohio competitors, I had not known them very long, and that which I knew about them, I didn't like. In most cases I didn't trust them. I felt their getting together in one room, multiple people  I consider six or seven multiple people  just didn't make sense.
(Tr. 1884-85.)
Defendants cross-examined DeBerry directly on these two issues, using the relevant grand jury and Bruil trial testimony to impeach *1306 his testimony. (Tr. 1845-72.) Upon being confronted with his prior sworn statements, DeBerry acknowledged that his testimony reflected some inconsistency. During closing arguments, defense counsel again brought the inconsistencies to the attention of the jury.

b. Discussion

In arguing that the Court must conduct an evidentiary hearing on the issue of whether DeBerry committed perjury, Defendants rely almost entirely on United States v. Wallach, 935 F.2d 445 (2d Cir.1991). In that case, the Second Circuit reversed the defendants' convictions and remanded the case for a new trial on the basis of the perjury of Guarglia, a co-conspirator witness who served as "the centerpiece of the government's case." Id. at 457. During direct examination, Guarglia testified that, although previously a compulsive gambler, he had not gambled at any time between the summer of 1988 and the trial in June, 1989, at the direction of the prosecutors in the case. On cross-examination, Guarglia admitted that he had signed gambling markers at an Atlantic City casino in September and October, 1988, but explained that he had not gambled during that period but, instead, had drawn the markers and cashed in the chips to pay off certain debts he believed he owed. Defense counsel attempted to introduce extrinsic evidence that Guarglia had, in fact, gambled on those occasions, but the government objected on the basis that, under Fed.R.Evid. 608(b) extrinsic evidence offered to impeach a witness' credibility is subject to exclusion. The court sustained the objection.
Subsequently, according to the government, in December, 1989, prosecutors learned of Guarglia's perjury, and ultimately prosecuted him for that offense. In an April, 1990, decision, the trial court concluded that it was unnecessary to hold an evidentiary hearing to determine whether the government knew at the time of the trial that Guarglia was lying, finding that there was "neither allegation nor evidence that the government had any knowledge." Id. at 457. Based on that assumption, the trial court determined that there was no need for a new trial, because  using the more lenient standard for a new trial where the government did not knowingly use perjury  the court was not left "with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988).
On appeal, the Second Circuit reversed, not because the trial court had failed to provide an evidentiary hearing, but because
Defendants placed before the government and the court powerful evidence that Guarglia was lying. Although this information was not formally admitted into evidence, it nonetheless cast a dark shadow on the veracity of Guarglia's statements. We fear that given the importance of Guarglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious  that is, that Guarglia was not telling the truth.... [B]ecause we are convinced that the government should have known that Guarglia was committing perjury, all the convictions must be reversed.
Wallach, 935 F.2d at 457.
As noted above, Defendants do not here attempt to argue that this Court should order a new trial because DeBerry perjured himself. Indeed, by instead requesting a hearing they implicitly recognize that the facts as adduced at trial  and, indeed, the facts as presently known to the parties, whether or not introduced into evidence  do not necessarily lead to the conclusion that DeBerry committed perjury on the stand during the instant case. Therein lie the crucial distinctions between Wallach and the instant case.
In Wallach, the Second Circuit reviewed the record of the trial, in which extrinsic proof of the witness' perjury was not presented to the jury, but was known to the prosecutors. As a result, the appellate court could conclude  without benefit of an evidentiary hearing  that the prosecutors knew or should have known that Guarglia was lying. Such is not the case here, where the Defendants admit that an evidentiary hearing would be required to determine whether the prosecutors knew or should have known of the alleged perjury. Even more important, *1307 unlike the jury in the instant case, the jury in Wallach was not privy to the extrinsic evidence from which they could have determined for themselves whether the witness had committed perjury; as such, the jury had only Guarglia's own unimpeached words and explanations with which to determine the veracity of his claim that he had stopped gambling. By stark contrast, defense counsel in the instant case were able to fully inform the jury of DeBerry's contradictory statements, thereby providing the jury with sufficient evidence with which to assess DeBerry's veracity.
As the government correctly notes, the Circuit's decision in Wallach does not stand for the proposition that an evidentiary hearing regarding potential perjury is required any time a government witness makes a statement that is arguably  or even clearly  inconsistent with past sworn statements. Indeed, the Wallach court's remarks about evidentiary hearings are found solely in the context of the court's recounting of the procedural history of the case. The Circuit's disagreement with the district court stemmed not from that court's decision not to hold a hearing, but instead from the Circuit's view that the trial court erred in not recognizing that the government should have known about the perjury  a conclusion it was able to make without benefit of a hearing. Thus, Wallach provides no guidance as to when such a hearing would be mandated. The Court is satisfied that in the instant case no such hearing is required.
Despite Defendants' contention that DeBerry's contradictory comments present a unique circumstance that requires extraordinary measures and implicates prosecutorial misconduct, the Court finds that the Defendants instead have presented only a "gardenvariety" case of prior inconsistent sworn statements. In such circumstances, the rules of evidence provide an adequate and suitable remedy: impeachment of the witness' current testimony through the introduction of the prior inconsistent statement. Ultimately, "[p]resentation of a witness who recants or contradicts prior testimony is not to be confused with ... perjury. It was for the jury to decide whether to credit the witness." United States v. Holladay, 566 F.2d 1018, 1019 (5th Cir.) (per curiam), cert. denied, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978), quoted in United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir.1989). That is, a court need not conduct a mini-trial on each occasion a government witness contradicts previous statements; nor will the government be assumed to be suborning perjury with each such inconsistency on the part of their witnesses. Such a procedure would usurp from the jury its proper role as the finder of fact, and the arbiter of credibility.[36]
In this case, the jury was provided with sufficient evidence upon which to base its determination of whether DeBerry told the truth at trial and whether the statements were, in fact, irreconcilable. Therefore, the Defendants' motion for an evidentiary hearing is denied.

5. Access to Prosecutors' Notes

Defendants' next argue that they are entitled to a new trial on the basis that they were denied access to the notes taken by prosecutors during their interviews with Benjamin DeBerry. The history of the Defendants' request for the prosecutors' notes began with a pretrial motion for disclosure of certain exculpatory materials, including those interview notes. In ruling on that motion, this Court noted that the work product of government attorneys is protected under Fed.R.Crim.P. 16(a)(2), which states that:
Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government *1308 agents in connection with the investigation or prosecution of the case ...
Applying that rule to the Defendants' request, the Court commented:
The exceptions noted in the rule regard the defendant's statements, criminal record, and reports of examinations and tests conducted in connection with the investigation. Under this rule and its exceptions, the government is not allowed to withhold discoverable information and statements (including information that must be disclosed pursuant to Brady, Giglio, Jencks, and other discovery rules) merely by claiming it is included within reports and memoranda. Neither, however, is the government required to reveal the entirety of the documents within which such statements and information are contained. Instead, the government need only reveal the substance of the discoverable material, albeit in a detailed and informative manner. The Defendants provide no Second Circuit case law indicating that this Court has any obligation to disregard Rule 16(a)(2) and require the government to turn over its notes and work product to defense counsel.
(Ruling of February 7, 1994 at 18.) At that time, the Court ordered that the government provide the Defendants with detailed summaries of exculpatory statements made in the course of the government's investigation and interviews, and with verbatim transcripts of statements, if such existed. However, the Court denied at that time the Defendants' request that the Court review the prosecutors' notes in camera.
Subsequently, the Defendants filed a supplemental request for disclosure of exculpatory material, including the prosecutors' notes, arguing that the government had failed to comply with the Court's February 7, 1994 order. In an abundance of caution, the Court took the rather extraordinary step of ordering the government to produce those notes for in camera review. Following that review, the Court ordered the disclosure of certain pieces of information identified in notes taken during the interviews of Andrew Campbell and Benjamin DeBerry.
Without benefit of supporting case law, the Defendants now argue that a new trial is necessary because the defense of their case was severely hampered by the Court's unwillingness to order the disclosure of all prosecutors' notes regarding interviews with DeBerry. Defendants list three ways in which they were prejudiced by this lack of access: first, that they were prevented from using the notes to impeach DeBerry in regard to the consistency of his statements as to the Chicago meeting; second, they could not investigate the veracity of DeBerry's claim that he consistently told the prosecutors that there were two meetings with Lima and Milikowsky during which price-fixing was discussed; and third, that they could not investigate if and when DeBerry told the prosecutors about his "concealment" conversation with Milikowsky.[37]
Defendants do not cite  nor can this Court find  any precedent supporting the proposition that a denial of access to the notes of a prosecutor can result in constitutional error, particularly where a court has engaged in an in camera review of those notes. In essence, the Defendants seek to substitute their view of what is material and relevant for that of not only the prosecutors, but the Court as well. There is no support in the law for such a suggestion:
Although the eye of an advocate may be helpful to a defendant in ferreting out information ... this Court has never held  even in the absence of a statute restricting disclosure  that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical *1309 case where a defendant makes only a general request for exculpatory material under Brady ... it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.[38]
Pennsylvania v. Ritchie, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987) (citations omitted).
In Ritchie, the Supreme Court made reference to Fed.R.Crim.P. 16(d)(2), which states: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule [mandating exculpatory evidence], the court may ... enter such ... order as it deems just under the circumstances." In the instant case, the Defendants twice brought to the attention of this Court their concern that the government had not disclosed to them all exculpatory material included in the prosecutors' notes. In response, the Court "entered such orders as it deemed just," including an order that the government produce the records for in camera review. The Constitution requires no more.

6. Prejudicial Comments during the Government's Summation

Defendants' sixth basis for a new trial arises from the government's closing argument, during which the prosecutor observed that:
Mr. Steinbach[, counsel for Defendant Milikowsky,] asked hundreds of questions to Mr. DeBerry ... But Mr. Steinbach didn't ask Mr. DeBerry one question about what took place in that meeting on November 9th. He didn't ask Mr. DeBerry one question about what was discussed that day between DeBerry, Milikowsky and Lima, and of course he didn't, because he already knew the answer. He knew that these three competitors weren't meeting to talk about steel purchases. They were meeting to fix prices. They were meeting to coordinate this upcoming January 1989 price increase.
(Tr. 2046-47.) Defendants contend that the prosecutor's comments were highly prejudicial. Specifically, Defendants believe that the government's characterization of the evidence denied the Defendants a fundamentally fair trial in that it:
(1) improperly impugned the integrity of defense counsel; (2) misled the jury about the role of defense counsel; (3) interjected the irrelevant issue of defense counsel's knowledge into the case; (4) inappropriately relied on evidence not in the record; and (5) impermissibly commented on the defendant's failure to present evidence and to testify.
(Defs.' Mem. at 70.)
Defendants objected to these comments immediately after the conclusion of the government's argument; in response, the Court stated that it was willing to take immediate corrective action. (Tr. 2064, 2072.) Defense counsel suggested that closing arguments for the Defendants proceed and requested that the Court provide them with time to draft a corrective instruction. The Court granted that request, and closing arguments proceeded accordingly. Ultimately, defense counsel informed the Court that they "couldn't think of any way to cure [the statement] and I'm afraid anything the Court would say would cause further damage." (Tr. 2137.) Nonetheless, in his closing, Attorney Steinbach did take corrective action, asking the jury:
What do you expect Mr. DeBerry would have told me? Do you think if I would have asked him "What did you say at lunch?" he suddenly would have changed his story? He would have given the exact same answers he gave on direct. He would have said, "I met with Dan and Bill *1310 and we agreed to fix prices and on the order," et cetera.
You can't ask the witness to change information right in front of your eyes, but what you can do is ask him to be specific every time he testifies under oath ...
(Tr. 2185.)
Under Second Circuit precedent, the standard for disturbing a conviction on the basis of improper argument by the prosecution is relatively stringent:
The Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone" in an otherwise fair proceeding. United States v. Young, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) ... Whether a prosecutor's improper remarks result in a denial of due process depends on whether the remarks caused "substantial prejudice" to the defendant.... In determining whether or not substantial prejudice exists, this Court has "adopted a contextual approach that considers the following factors: `the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'"
United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989) (citations omitted), cert. denied, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). See also United States v. Thompson, 29 F.3d 62, 66 (2d Cir.1994). Thus, the Court must determine whether the remarks were improper, and, if so, whether they resulted in substantial prejudice.
When the Defendants first raised their objection to the government remarks, this Court observed that the prosecutor's comments were "ambiguous," and were susceptible to two interpretations: either that Attorney Steinbach knew that DeBerry would repeat his previous testimony or that he knew that the meetings were about price-fixing, presumably because his client had so informed him. Upon review of the statement in context, the Court confirms its observation at trial as to the ambiguity of the statement. Nonetheless, because it is improper for a prosecutor to "refer[] to information not in evidence (i.e. what a defense lawyer knew about his client's involvement)," Tutino, 883 F.2d at 1136, the Court believes that these remarks must be considered error in that any reasonable juror could have construed the prosecutor's statement as such an impermissible reference.[39]
Having so determined that the remarks constituted error, the Court must consider "the severity of the conduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper statements," id., in order to determine whether substantial prejudice resulted. In this regard, the Court finds the Second Circuit's analysis in Tutino to be instructive. In that case, the prosecutor stated during his rebuttal summation
You think it really wasn't [defendant] Bellomo in that car? You think somebody else got into the car and took off in it? Of course it was Bellomo. [Defense counsel] wants you to believe ... that Mr. Bellomo was in the Audi all day. But he wants you to believe that it was someone else [who] jumped into it at 5:40, someone else met with Tutino and Guarino at 6:06, someone else got out of Larca's Camaro into the Audi at 6:57. Does he want you to believe that there is a Laborio Bellomo clone look-alike running around? A Laborio Bellomo duplicate or clone? It's preposterous.
And you know what? [defense counsel] Mr. Pollok knows it. Because if you remember he told you at the end of his summation, he said well, either it wasn't Bellomo or if it was, it was just what he called mere association. He couldn't take a position on it. Because he knows it was Bellomo.

Id. at 1135-36 (emphasis added). After the defendant objected to the prosecutor's statement, *1311 the trial judge immediately issued curative instructions: "The jury will disregard that; it's not a question of what an attorney knows or doesn't know, it's a question of what has or has not been proved in evidence." Id. Later, the judge clarified his instruction, stating in pertinent part that
There is no basis whatsoever for any kind of a statement of what Mr. Pollok knows or doesn't know ... and you are not to consider anything to do with what any attorney knows or believes or doesn't know or doesn't believe. The question is for you to focus on the evidence in the case, or the lack of evidence in the case. And on all issues the government has the burden of proof beyond a reasonable doubt.
Id.
After applying the three-part analysis, the Tutino court concluded that the error was harmless:
[T]he prosecutor's misconduct was very minor. His remarks were confined to the summation, and were made in response to defense contentions. The prosecutor never disregarded the district court's instructions, and in fact apologized in front of the jury, which provides some basis for inferring that his remarks were unintentional. ... In addition, the likelihood that any prejudice resulted from this solitary remark is extremely remote. The remark came after two days of summation at the very end of a trial that spanned seven weeks. The risk of influencing the jury through one inappropriate remark was therefore minimal.... In addition, the curative instructions that were given both immediately and moments later were sufficient to eliminate any possible prejudice from the prosecutor's remarks.... Thus, the prosecutor's remark did not deprive Bellomo of a fair trial.
Id. at 1136-37 (citations omitted).
In comparing the instant case with Tutino, the Court finds that the misconduct here was similarly "very minor." As in Tutino, the comment was isolated within a lengthy summation, at the end of a trial that lasted over two weeks. Moreover, as in Tutino, there is no indication that the prosecutor intended to improperly remark upon the knowledge of opposing counsel.[40] The case at bar differs from Tutino in that the prosecutor's statement in Tutino, while similar to the remarks in the instant case, was not susceptible to any interpretation other than that defense counsel had "inside" knowledge of the defendant's guilt. Consequently, the misconduct appears to have been less egregious here than in Tutino.
As to the second factor, curative measures in the instant case were taken in the form of Attorney Steinbach's explanation in his summation that he did not ask DeBerry what was discussed at the Chicago meeting because he knew that DeBerry would not change his testimony while on the stand. This statement served to clarify for the jury that Attorney Steinbach's decision not to question DeBerry on the subject was made on the basis of purely tactical concerns, rather than on the basis of knowledge gained from confidential communications from his client. In contrast to Tutino, no specific corrective instruction was delivered by this Court; notably, however, the Court's decision not to so instruct the jury was made in deference to defense counsel's conclusion that "anything the Court would say would cause further damage."[41] (Tr. 2137.) The Court did provide a general curative instruction when it charged the jury that the statements, questions, and arguments of counsel are not evidence, and that the jurors' recollection  rather than that of counsel  was to guide them toward a verdict.
In light of these curative measures, this Court is satisfied that the jury verdict was not influenced by the prosecutor's remarks. That is, as in Tutino, the "certainty of conviction *1312 absent the improper statements" is sufficient to sustain the verdict. The Defendants' motion for a new trial on this basis is therefore denied.

7. New Trial to Avoid Manifest Injustice

As a final basis for a new trial, Defendants argue that the Court should exercise its discretion under Fed.R.Crim.P. 33 to grant a new trial where "it would be manifest injustice to let the guilty verdict stand." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992). In support of their motion, Defendants argue that the testimony of Benjamin DeBerry "should be given no weight," that William McEntee's testimony was excessively "vague and nonspecific," and that there was insufficient evidence  absent DeBerry's testimony  that any meeting allegedly attended by Defendant Milikowsky concerned price fixing. (Defs.' Mem. at 78-79.)
Although the standard for granting a new trial is more lenient than that for acquittal, id., the Second Circuit has stated clearly that courts should be reluctant to set aside the factual determinations of a jury, even where perjury has been identified:
It has long been our rule that trial courts "must defer to the jury's resolution of the weight of evidence and the credibility of the witnesses".... It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. ... Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.... But the trial judge's rejection of all or part of the testimony of a witness does not automatically entitle a defendant to a new trial.... The test is whether "it would be a manifest injustice to let the verdict stand."
Id. (citations omitted).
In this ruling, as well as in pre-trial rulings, this Court has assessed Defendants' numerous arguments that Benjamin DeBerry would or did commit perjury in this and/or other proceedings. On none of these occasions has the Court been able to conclude as a matter of law that the facts and circumstances were so extraordinary as to require that the determination of DeBerry's credibility be taken away from the jury. In this final argument for a new trial, the Court finds no new "exceptional circumstances" that would warrant such a drastic measure. Neither have the Defendants presented evidence to require such action in regard to the testimony of William McEntee or Robert Okra.
In Sanchez, the Second Circuit ruled "that it was abuse of discretion for the district judge to grant a new trial," despite inconsistencies  and even assuming perjury  in the testimony of three officers. In so doing, the court wrote:
Manifest injustice cannot be found simply on the basis of a trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in the record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"
Id. Considering "the totality of this case," id., the Court must answer this question "yes." First, as discussed in the context of the Defendants' variance argument, supra, this Court conducted a detailed analysis of the evidence in this case to determine whether the government presented sufficient evidence to convince a reasonable jury that the Defendants were members of the single conspiracy alleged in the indictment. For the reasons stated in that section of this ruling, the Court finds that the evidence presented by the government was sufficient to allow a reasonable jury to find the Defendants guilty beyond a reasonable doubt. Moreover, notwithstanding the Defendants' contentions that the testimony of DeBerry, McEntee, and Okra should be discounted, this Court concludes that the evidence presented by the government was not so clearly "incompetent, unsatisfactory, or insufficient" that the Court's credibility assessment should be substituted for that of the jury. The Defendants' motion for a new trial on this basis is therefore denied.

B. Motion for a Judgment of Acquittal

Finally, Defendants seek from this Court a judgment of acquittal pursuant to Fed. R.Crim.P. 29, arguing that "no rational trier of fact could find the defendants guilty beyond *1313 a reasonable doubt of the conspiracy charged in the indictment." (Defs.' Mem. at 77.) The Defendants' burden is indeed a heavy one, for the truth of the government's evidence must be assumed, Sanchez, 969 F.2d at 1414, and the Court "must credit every inference that could have been drawn in the government's favor, and ... affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." United States v. Giraldo, 822 F.2d 205, 213 (2d Cir.) (citations omitted) cert. denied, 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987).
This Court has already determined that the evidence presented by the government was sufficient for purposes of withstanding a motion for a new trial pursuant to Fed. R.Crim.P. 33. Because the Defendants must meet a standard significantly more stringent than that for a new trial in order to obtain a judgment of acquittal, the Defendants' motion for judgment must be denied, a fortiori.

CONCLUSION
For the reasons discussed above, the Defendants' joint motions for a new trial [Document No. 203] and for a judgment of acquittal [Document No. 205] are DENIED.
SO ORDERED.
NOTES
[1] On the basis of this precedent, this Court denied Defendants' pretrial motion to dismiss the indictment as unconstitutionally vague. (Ruling, February 7, 1994 at 2-6.)
[2] In this ruling, the Court uses the names interchangeably.
[3] "Okra" is a shortened version of the witness' born name, Okrasinski. Mr. Okra testified that he uses the shorter name for business purposes.
[4] Such differences in specifications concern such features as the gauge of the steel, the type of drum head or liner, and whether the buyer requests customizing such as the painting of a logo. Drum prices may also vary as a result of differing transportation costs related to delivery.
[5] On cross-examination, Mr. McEntee was unable to give any specifics about the dates or locations of the discussions he had with Defendant Milikowsky about Milikowsky's meetings with DeBerry and Lima. (Tr. at 393.)
[6] McEntee stated that he had no knowledge of any contact between Daniel Milikowsky and either Robert Okra or Andrew Campbell of Eastern Steel Barrel. (Tr. 338.)
[7] In regard to this alleged meeting, Okra recounted that he had been in Campbell's office "when [Campbell] received a phone call, I believe ... from Stanley Bey at Russell-Stanley telling him there was a meeting of executives from various steel drum companies that was going to be in Newark, New Jersey ..." (Tr. 567.)
[8] McEntee testified that he did not attend the meeting, and that he had no knowledge of Defendant Milikowsky attending the Newark meeting. (Tr. 392.)
[9] As to Defendant Milikowsky's presence at the meeting, the government introduced the testimony of FBI agent Charles Haywood, who stated his opinion that an erased entry on Defendant Milikowsky's calendar for May 22, 1987 (government's exhibit 68) stated "Marriott drum meeting, EWAK airport." (Tr. 741.) Moreover, the government introduced telephone records from Defendant Milikowsky's steel company, Jordan International, indicating that phone calls were placed from the Newark Marriott Hotel shortly before 11:00 am on May 22, 1987. (Gov't Exhibit 212.)
[10] Often, steel drum customers purchase their drums from more than one steel drum company. That is, one company might purchase steel drums from each of MACC, Russell-Stanley, Van Leer, and Eastern Steel Barrel.
[11] Mr. McEntee indicated in his testimony that he made Defendant Milikowsky aware of these types of contacts in the course of "general discussion regarding the marketplace and competitive situation[,]" (Tr. 170) and, to some extent, and on a more general level, through monthly reports. On cross-examination, McEntee stated that Defendant Milikowsky never directed him to make such contact with counterparts at the three competitor firms, and that McEntee never reported to Defendant Milikowsky about any specific calls to competitors in regard to a particular account. (Tr. 339).
[12] According to his testimony, Okra never had direct contact with Defendant Milikowsky. (Tr. 558.)
[13] As noted in the context of the Defendants' first claim of variance, the government's proof regarding the general price increases and the concept of threshold pricing are not mutually exclusive. Indeed the theories are quite compatible; from both McEntee's and Okra's perspectives, the general price increase announcements led to price verification calls, which were intended to ensure that the competitors did not allow prices to erode precipitously. Thus, a reasonable jury could have concluded that these common descriptions of the price verification calls  in which Okra participated through November, 1989  were evidence of the indictment's allegations of a single conspiracy that relied upon coordination among the "subordinates ... concerning the effective dates and specific price increases for new steel drums to be offered for sale to individual customers." (Indictment ¶ 8(f).)
[14] This Court thus has concluded that the government presented evidence sufficient to support a finding of a single conspiracy. The Court notes, however, that had it come to the opposite conclusion, the resulting variance would have caused substantial prejudice to the Defendants; were the threshold pricing actions held to be a distinct conspiracy, there would have been an insufficient basis upon which to consider ESB President Andy Campbell a co-conspirator of the Defendants, and the introduction of his statements through Robert Okra would have been harmful error.
[15] In that first exchange, defense counsel asked:

Q. In May 1990, you said one meeting was at the Newark Marriott, but you couldn't remember the location of the second meeting, right? A. I don't recall that. I recall  I recall saying that there were two meetings.... I don't recall now whether I told them the exact location of the meetings, but I recall there were two specific meetings ... with Mr. Milikowsky and Mr. Lima and myself sitting face-to-face discussing prices.
(Tr. 1747-48.)
[16] Defense counsel read the following from the grand jury transcript:

Q: On November 9, [1988] ... you have an indication of a meeting with D. Milikowsky at Hilton O'Hare for lunch. Can you tell us what that related to?"
A: I don't recall whether I met there or not. Sometimes I got entries that are for one or two things ...
(Tr. 1770-71.)
[17] Notably, the Second Circuit indicated in Helmsley that this three-part analysis may be unnecessary under certain circumstances:

We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial, and we have permitted such an attack to succeed, despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity.
985 F.2d at 1208. Thus, a prosecutors' use or construction of false testimony in closing argument is susceptible to challenge only where the defendant was unaware of, and the prosecutor was directly involved in, the falsity. Here, as to the second prong, the prosecutors were "involved" in the falsity, insofar as their recollections of their interviews with DeBerry are the sole basis for the Defendants' contention that DeBerry's testimony was "false." Arguably, however, the Defendants would fail under the first prong of the test, as they were fully aware of the alleged "falsity," and cross-examined DeBerry extensively on the issue.
[18] The Court notes that, even were it to consider the specifically incorrect statements of DeBerry independent of the context of his testimony, the outcome would be no different, because the error was harmless. See infra.
[19] On one such occasion, DeBerry stated that:

I'm not sure whether it was in the grand jury or whether it was in my proffers to the government, or whether it was in the '93 trial that I told them [about the Chicago location]. I can't recall, or whether it was multiple occasions.
(Tr. 1771.) Notably, DeBerry acknowledged at least once that he had not told the government about the Chicago meeting during his May 1990 interview with prosecutors:
I always said there were two meetings, and my first recollection was the one in Newark at the Marriott. And in a later  I don't recall how much later, what I indicated was that there was a meeting at O'Hare Hilton attended by all three of us to discuss pricing activities.
(Tr. 1826 (emphasis added).)
[20] Defendants identify the following exchanges as those in which DeBerry testified falsely:

Q: Do you remember at all when you first told the government that you had a meeting with Mr. Milikowsky and Mr. Lima in the Chicago O'Hare Airport?
A: I thought it was in 1990, that I told them. I don't recall which meeting it was in 1990.
Q: You believe you told them that before you testified in the grand jury?
A: I think I did. As best I can recall, I did.
Q: It's your testimony now that it's your best recollection that in 1990, you told the government that you met Mr. Lima and Mr. Milikowsky in the Chicago O'Hare Hilton?
A: That's my best recollection, yes.
Q: And that would have been before you testified in the grand jury; is that correct?
A: That is correct.
(Tr. at 1769-70.)
Q: Isn't, Mr. DeBerry, the first time that you ever said that the Chicago O'Hare Hilton was a location for a price-fixing meeting April 1st, 1993? Isn't that the first time you ever told that to the government?
A: I believe I told them earlier than that. I believe I mentioned the two meetings, which I did mention, I mentioned two meetings in May of 1990 to the government. In subsequent meetings, I can't recall whether I mentioned both locations or one location during my grand jury testimony. Without rereading it, I'm not going to know whether I mentioned both locations or one location.
(Tr. 1772).
Q: So we've established that your recollection for the May interview is you remember two meetings, but you don't remember locations or you don't remember what you said about locations and you don't remember what you may have said about dates?
A: I don't recall what was said on May 10th, whether it was May 10th or a different date ...
Q: You have testified already, have you not, this morning that before you set foot in the grand jury, you had told prosecutors that one of the meetings was at the Chicago O'Hare Hilton?
A: I believe that is correct.
(Tr. 1794-95.)
Q: So it's your best recollection that you told the government, prior to the grand jury appearance, that you had a meeting in the Chicago O'Hare Hilton, right?
A: I still have a difficult time. I mean I 
Q: That's what you testified this morning sir.
A: I think that is correct. I think I told them before '90.
(Tr. 1878.)
[21] During cross-examination, DeBerry gave an explanation for his difficulty in remembering when he gave the government any particular piece of information:

One of the difficulties I continue to have, I've had four days of grand jury testimony, I think a similar number, three or four days in a previous trial, a number of communications with [prosecutors] Mr. Schmoll or Mr. Byrne or others concerning, you know, price-fixing activities.
(Tr. 1826.)
[22] Defendants attempt to distinguish this case by noting that the witness in Mills made only one false statement, while DeBerry repeated his false statement nine times, and that "the witness [in Mills] herself later provided sufficient information to correct any misimpression." (Defs.' Reply Mem. at 10.) However, Mills is on point precisely because of the latter argument of the Defendants; in considering the "entire record," as did the Mills court, this Court finds that, by acknowledging his failure to testify about the Chicago meeting before the grand jury and by answering equivocally about when he told prosecutors of the Chicago location, DeBerry himself provided evidence sufficient to correct any misimpression that he was certain as to when he told the government, or that he had been consistent in his story from his first meeting with prosecutors in May, 1990.
[23] Under such circumstances, however, the Court would still find the prosecutors failure to correct the statement to be harmless, for the reasons discussed infra.
[24] The Glover court affirmed the defendants' conviction on the basis that the prosecution did not act improperly during trial because it "did not have firm information on the inaccuracies in Hardy's testimony until several days after the jury returned its verdict." 588 F.2d at 879.
[25] Indeed, the Court is concerned about the potential consequences that could result from a ruling that prosecutors must "correct" every misstatement, omission or inconsistency  however inconsequential or tangentialwhen a witness diverges from the prosecutor's recollection of his or her interviews with a witness. It should not be forgotten that a prosecutor's  rather than the witness'  recollection could be mistaken.
[26] The Defendants contend that the government also compounded the prejudice arising from DeBerry's inaccurate testimony by focusing during its redirect examination on the consistent portions of DeBerry's story. The Court agrees with the government that the prosecutors stayed within the proper bounds of rehabilitation, without eliciting any testimony in regard to when DeBerry recalled the location of the second meeting.
[27] The Court believes the prosecutor erred in that he construed DeBerry's testimony in a manner that the government knew to be inaccurate. See United States v. Valentine, 820 F.2d 565, 570 (2d Cir.1987) ("[T]he government should, of course, never make affirmative statements contrary to what it knows to be the truth.") (quoting United States v. Universita, 298 F.2d 365, 367 (2d Cir.) cert. denied, 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962)); United States v. Laury, 985 F.2d 1293, 1307 (5th Cir.1993) (finding error where prosecutor mischaracterized during summation the testimony of certain government witnesses; error held harmless). Similarly, the remarks might also be challenged because they "jeopardized the defendant's right to be tried solely on the basis of the evidence presented to the jury[,]" United States v. Young, 470 U.S. 1, 18, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985), by impermissibly arguing facts not in evidence  i.e. that DeBerry told the government on May 10, 1990, that the second price-fixing meeting occurred in Chicago. DeBerry did not so testify.

Under either theory, the Court finds the error to be harmless, considering the "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989). Specifically, the gravity and import of the misstatements were minor, and the effect upon the verdict was insignificant, for reasons discussed infra at 1301-1302.
[28] The Court notes that, even were they germane, the Second Circuit cases cited by Defendants in this context involve prosecutorial misconduct significantly more egregious than that alleged here. See Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (habeas relief granted where prosecutors knowingly misrepresented to the jury that a pair of shorts allegedly owned by the defendant were heavily stained with blood, when post-trial analysis indicated that the shorts were stained with paint); Valentine, 820 F.2d at 571 (new trial granted where, by failing to disclose previous grand jury testimony that contradicted its theory of the case, the prosecutor "gave the trial jury an unfair and inaccurate impression that documentary evidence and oral testimony uniformly substantiated the government's theory of culpability"); Taylor v. Lombard, 606 F.2d 371, 375 (2d Cir.1979) (habeas relief granted where prosecutors knowingly elicited and used in summation perjured testimony, which, if corrected, would have corroborated the defendant's story).
[29] Indeed, considering the exhaustive cross-examination of DeBerry on this and other issues, the Court believes that DeBerry's testimony was the least convincing of the evidence presented as to the date and location of the Chicago meeting.
[30] The government cites United States v. Rosner, 516 F.2d 269, 273-74 (2d Cir.1975) cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976) for the proposition that the error was harmless because proving up DeBerry's inconsistency merely would "tend[] further to impeach the credibility of a witness whose character has already been shown to be questionable." Defendants argue that Rosner is inapposite because the more lenient standard for nondisclosure of exculpatory material  rather than that for prosecutorial misconduct  was applied in that case. While not relying on Rosner, the Court notes that, not only did the Defendants impeach DeBerry's credibility generally by cross-examining him with prior inconsistent statements, with information about an alleged fraudulent violation of a severance agreement with Van Leer, and with the fact of his governmental immunity, inter alia, but the Defendants were able to impeach DeBerry on the specific issue in regard to which they claim false testimony  his recollection of the Chicago meeting.
[31] The Court would come to the same conclusion of "harmless error" even were DeBerry's testimony itself "false" for purposes of the Helmsley test. As noted above, defense counsel effectively impeached DeBerry's recollection of the Chicago meeting, and the government provided sufficient evidence of the existence, date, and location of that meeting independent of DeBerry's testimony to convince the Court that the jury's verdict would not likely have been affected by a revelation that DeBerry did not provide the location of the second meeting until April, 1993.
[32] For that reason, the case at bar differs significantly from Carr, also cited by the Defendants. In that case, a witness who had been arrested with the appellant and appellant's son testified nineteen months after the arrest that appellant's son  rather than the appellant  redeemed from a pawn shop the firearms at issue in the case. The Second Circuit affirmed the conviction over the appellant's contention that the government improperly used the witness' nineteen-month silence to impeach his testimony. Unlike Carr, where the witness had been silent until trial about a substantial piece of exculpatory information, DeBerry had not been silent about the existence of the Chicago meeting. Rather, he had merely failed, at least according to the Brady letter, to provide details about that meeting at his first interviews.
[33] To the extent that Defendants believe that they were impermissibly prohibited from using extrinsic evidence to impeach DeBerry's allegedly incorrect statements regarding when he told prosecutors about the Chicago meeting, the Court finds  for the same reasons described above as to why DeBerry's testimony on this issue was not "false"  that his testimony was not inconsistent with his previous statements to prosecutors (as described in the Brady disclosures); notwithstanding Defendants' contention that DeBerry "flatly denied ... on several occasions that he first mentioned the Chicago O'Hare meeting to the government in 1993," the overall impression created by Defendants' cross-examination of DeBerry was that he had not been consistent in his recollection about the Chicago meeting over time, and that he was unable to recall when he told prosecutors the location of that meeting. The Court finds now, as it did during trial, (Tr. 1821-22), that DeBerry's testimony in this regard was not sufficiently inconsistent with the Brady disclosures to warrant the use of extrinsic evidence.
[34] Defendants argue that the Brady letter should have been admitted into evidence as the nonhearsay admission of a party opponent, pursuant to Fed.R.Evid. 801(d)(2). In support of this contention, the Defendants cite United States v. GAF Corp., 928 F.2d 1253 (2d Cir.1991), in which the court ruled that, under certain circumstances, a prior inconsistent bill of particulars may be introduced as an admission of a party-opponent. Notably, the Defendants do not cite, nor can this Court find, any precedent recognizing Brady disclosures as nonhearsay admissions of the government.

As it did during trial, (Tr. 1821-22), this Court finds that the holding in GAF does not mandate the introduction of the Brady letter as substantive evidence. First, the Court does not believe that the GAF court contemplated that its rather narrowly tailored decision would be read to require that, with each Brady disclosure  particularly those for which no independent documentary evidence exists  prosecutors would, in effect, be stipulating to the introduction of that disclosure into evidence. Such a rule might well dissuade prosecutors from erring on the side of liberal disclosure, to the ultimate detriment of criminal defendants.
Second, the GAF court recognized that "in order to avoid infringing other important interests," id. at 1261, prior pleadings may be introduced as admissions only under circumscribed conditions. One such limitation is that "the district court must be satisfied that the prior argument involves an assertion of fact clearly inconsistent with similar assertions in a subsequent trial." Id. at 1261 n. 3 (citing United States v. McKeon, 738 F.2d 26, 33 (2d Cir.1984)). This Court having ruled that DeBerry's statements were not sufficiently inconsistent with the Brady letter to warrant the use of extrinsic evidence, the letter would not be admissible under GAF, even were the Court to accept Defendants' contention that the Brady letters are comparable to bills of particular in this context.
Finally, regardless of whether the Court should have admitted the Brady letters as admissions of a party opponent, any resulting error was harmless, as discussed infra at 1304.
[35] Of course, even though prior silence about details later recalled at trial is not "inconsistent" under Leonardi, the Court allowed the Defendants to introduce grand jury testimony to highlight DeBerry's previous failure to recall the location of the second meeting. Because the grand jury transcripts convey the context and exact wording of the questions asked, and because DeBerry's answers were sworn, this extrinsic evidence did not suffer from the same problem of "ambiguity" as would the stipulation, the prosecutors' testimony, or the Brady letter.
[36] Elsewhere in their brief, the Defendants cite the Supreme Court's axiom in California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) that cross-examination is "the greatest legal engine ever invented for the discovery of truth". Defense counsel had the tool of cross-examination at their disposal, and used it effectively in impeaching DeBerry's testimony on the two issues in question. The Court will not now retry those issues, the properly instructed jury having made its determination about credibility.
[37] The Court notes that there would be severe limitations on the use that might be made of the notes, even had they been made available to defense counsel. First, because DeBerry never adopted the notes as his own, it appears unlikely that the Defendants would have been permitted to use the notes for purposes of impeaching on the basis of prior inconsistent statements. See Goldberg v. United States, 425 U.S. 94, 106-07, 96 S.Ct. 1338, 1346, 47 L.Ed.2d 603 (1976). Second, because the prosecutors likewise have not sworn or attested to the precision, completeness, and accuracy of their impressions and notations of what DeBerry said during the interviews, the notes would not likely be admissible at trial for any purpose.
[38] The Defendants have provided no basis upon which this Court can distinguish their desire to peruse the prosecutors' notes from that of all other criminal defendants who believe they would benefit from reading the prosecutors' interpretations and descriptions of interviews with unsworn witnesses. Were this Court to grant the Defendants' motion, it would set an absurd precedent, allowing defendants to scour the working notes of prosecutors upon the mere accusation that the government has not sufficiently disclosed every potentially exculpatory detail.
[39] The government contends that the comments were merely "fair comment upon unchallenged evidence." (Gov't's Mem. at 85.) Without addressing the issue of whether it was permissible for the prosecutor to remark on the fact that the Defendants had failed to contradict the testimony of DeBerry on this particular issue, the Court notes that it clearly was impermissible for the prosecutor to comment that the knowledge of the defense counsel was the reason for his failure to confront DeBerry. The government cites no case to the contrary.
[40] At sidebar, the prosecutor averred that he had intended the remark to reflect only that, having asked DeBerry hundreds of questions on other subjects, "he didn't ask what happened at the meeting or what was discussed because he knew the answer, because DeBerry had testified what was the answer[.]" (Tr. 2065.)
[41] Based on their decisions, the Court concludes that defense counsel determined that Attorney Steinbach's own explanation was preferable to one provided by the court, as in Tutino.