James KELLY,

v.

Larry MEACHUM.

No. 5:92cv348 (JBA).

United States District Court, D. Connecticut.

Dec. 24, 1996.

---

Richard A. Reeve, Michael O. Sheehan, Federal Public Defender's Office, New Haven, CT, for James J. Kelly.

James M. Ralls, III, Julia Dicocco Dewey, Office of the Chief State's Attorney, Rocky Hill, CT, for Larry R. Meachum.

## Ruling on Petitioner's Application for Writ of Habeas Corpus

ARTERTON, District Judge.

### I. Introduction

On June 15, 1992, petitioner James J. Kelly filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging three errors in his state court conviction of November 22, 1985, for kidnapping in the second degree, larceny in the second degree, and sexual assault in the fourth degree. Petitioner asserts the following constitutional errors: (1) the trial court closed the courtroom during testimony of the complaining witness; (2) the trial court excluded certain evidence pertaining to a prior sexual assault case involving the same complainant; and (3) the trial court denied petitioner and his attorney access to all records concerning the complainant's psychiatric problems, the complainant's participation in rape crisis counseling, the complainant's testimony in the prior sexual assault case, and all records and transcripts relating to that prior case.

For the reasons stated below, petitioner's application for a writ of habeas corpus is granted in part and denied in part.

### II. Facts

The relevant facts were summarized by the Connecticut Supreme Court as follows:

The jury could reasonably have found that on April 1, 1985, the complainant drove to New Haven from her parent's home in New Jersey to visit friends, and spent the night with her boyfriend at Yale University. The previous year she had been a student at the university. On April 2, at about 6 a.m., she left her boyfriend's room, planning to drive to her place of employment in New Jersey. Her car was parked in a nearby parking lot. As she walked toward her car, complainant contends that the petitioner began to follow her, and when she reached her car and turned around, he was standing next to her. The defendant told her that his name was Pete, that she was pretty, and that he wanted her to be his girlfriend. While repeatedly putting his hand in his pocket he told her that he had a knife and could make her do whatever he wanted. He asked her if she had any money and she gave him ten dollars, hoping that he would then leave her alone. Instead, the defendant pushed her against the car, tried to kiss her and grabbed roughly at her breasts and thighs. She unsuccessfully tried to push him away. She did what the defendant ordered because she thought that he had a knife and was afraid of him. As he ordered, she opened the door, let him in and also entered the car herself in order to drive.

The complainant drove the car to a stoplight near the exit of the parking lot. At that point the defendant ordered her to let him drive. They changed seats and he drove the car to the area of the Yale–New Haven Hospital where he stopped in front of a house. He stated that he lived there and wanted to go inside, but could not find a parking space. He stopped the car in the driveway next to the house and forced the complainant to perform fellatio. Afterwards, as the defendant was driving around, the complainant persuaded him to stop at a pay telephone because she had told him that if she did not arrive at work on time, her employer would come looking for her. The complainant intended to call the police, but the defendant followed her to the telephone. She called her boyfriend's room and spoke with his roommate. After hanging up she asked the defendant for permission to make another call, but the defendant became angry and told her to get back in the car, saying "No more calls."

Because she was afraid of the defendant the complainant got back into the car, but

jumped out at the next traffic light and ran along the street toward Yale–New Haven Hospital. The defendant followed her in the car and then on foot. When he caught her he stated, "Nobody ever runs away from me," and then pinned her against a wooden wall surrounding a construction site, kissed her and touched her breasts and inner thighs.

While the complainant and the defendant were struggling, Patricia Bougourd drove by, came to a stoplight and noticed them struggling. She motioned to the complainant and unlocked the passenger door of her car. The complainant broke away from the defendant, ran to Bougourd's car and got inside. Bougourd drove the complainant to the nearby YWCA, and called the police.

Officer Hilda Kilpatrick responded to Bougourd's call. She interviewed the complainant as well as Bougourd and then broadcasted on the police radio a description of the defendant, the complainant's car and its license number. Soon thereafter, another police officer observed the defendant at the parking lot where the complainant had parked her car overnight, stopped him, patted him down and found the complainant's car keys in his pocket. The complainant and Bougourd were brought to the parking lot and they both identified the defendant as the person from whom the complainant had escaped. The defendant was arrested.

*State v. Kelly,* 208 Conn. 365, 367–69, 545 A.2d 1048 (1988).

After a jury trial was held in the Superior Court of the State of Connecticut, New Haven Judicial District, at New Haven, petitioner was found guilty of kidnapping in the second degree, larceny in the second degree, and sexual assault in the fourth degree and sentenced to a total effective sentence of thirty-one years.

## III. Discussion

 A federal court can "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on a ground that he is in custody in violation of the United States Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "In most circumstances, prisoners seeking habeas relief must not only prove that constitutional violations occurred at trial, but also that such errors caused substantial prejudice or a fundamental miscarriage of justice." *Ciak v. United States,* 59 F.3d 296, 301 (2nd Cir.1993) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 619, 113 S.Ct. 1710, 1711, 123 L.Ed.2d 353 (1993)).

### A. Closure of Courtroom

The first issue that the Court will address is whether the trial court erred in closing the courtroom during certain testimony of the complaining witness ("D.M.").[1]

#### 1. Pertinent Facts

The pertinent facts relating to the closure of the courtroom are as follows:

> Prior to trial, on November 7, 1985, the state moved, pursuant to [Connecticut] General Statutes § 54–86f (rape shield statute), to close the hearing on the defendant's motion to offer evidence of a prior sexual assault on the complainant. After a hearing, the trial court granted the state's motion. The state thereafter proceeded with the presentation of its case and the direct examination of the complainant was conducted in open court and was complete on November 14, 1985. Prior to the commencement of her cross-examination, the trial court ordered the closure of the courtroom.

*Kelly,* 208 Conn. at 369–70, 545 A.2d 1048.

In granting the state's motion for a closed rape shield hearing, the Court stated, "Obviously, in light of the Legislature's adoption of the Statute, the policy which they are trying to pursue ... the rights that they are trying to protect are best served by a hearing in camera and could well be damaged without a hearing in camera." *Id.* at 372, 545 A.2d

---

1. Consistent with the practices of the parties in their briefs and with the state's interest in protecting the identities of victims of sex crimes, the complaining witness will not be identified in this opinion by her full name.

1048. At the closed hearing on November 14, 1985,

> the evidence presented consisted principally of the complainant's testimony. She testified that in February, 1984, during her freshman year at Yale University, she was walking back to her dormitory one night when she was approached by someone who dragged her into an alley and sexually assaulted her with a razor blade. She was cut on the breast and thighs and the razor blade was placed in her vagina. Ultimately, Walter Bolivar was arrested and charged with sexual assault and unlawful restraint. After a public jury trial he was acquitted. At his trial Bolivar asserted an alibi defense and he and his girlfriend testified in support of that defense. The defendant Kelly sought to examine the complainant about the Bolivar incident, in order to compare it with the circumstances of the charges against him, and to have Bolivar and his girlfriend testify that the February, 1984 incident did not occur.

*Id.* at 373, 545 A.2d 1048.

### 2. Legal Standard

The Sixth Amendment provides a guarantee that the accused shall enjoy the right to a "public trial." "[A]lthough the right to a public trial is not absolute, there is '[t]he presumption of openness.'" *Guzman v. Scully,* 80 F.3d 772, 774–75 (2d Cir.1996) (citation omitted). In *Guzman,* the Second Circuit reviewed the four requirements that must be met before the public may be barred from a criminal trial:

> ■ the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> ■ the closure must be no broader than necessary to protect that interest,
>
> ■ the trial court must consider reasonable alternatives to closing the proceeding, and
>
> ■ it must make findings adequate to support the closure.

*Id.* at 775 (quoting *Waller v. Georgia,* 467 U.S. 39, 48, 104 S.Ct. 2210, 2216, 81 L.Ed.2d 31 (1984)). In cases where there is a partial, rather than complete closure as in the petitioner's trial, the moving party, in order to meet the first requirement, need only show a "substantial reason" rather than an "overriding interest."

### 3. Trial Court's Violation of *Waller*

The Connecticut Supreme Court reviewed the testimony at the closed hearing and noted that:

> Bolivar's trial was public and aside from a general reference to the rape shield statute, the trial court made no findings as required by *Waller v. Georgia.* Moreover, while this case was pending the complainant participated in an interview that resulted in a newspaper article in the New Haven Register where she discussed both cases.

*Kelly,* 208 Conn. at 374, 545 A.2d 1048. The Connecticut Supreme Court concluded "on the basis of the record, that the November 7 closure order was improper." *Id.* After review of the record, this Court concurs with the Supreme Court's finding that the trial court improperly closed the courtroom at the petitioner's trial in that the trial court failed to make any findings adequate to support the closure.

The State argues that even though the trial court's findings were not made as required by *Waller,* petitioner must prove prejudice to obtain relief. Indeed, the Connecticut Supreme Court denied relief for precisely the reason that the trial court's error was harmless. *Id.* at 377, 545 A.2d 1048. However, "it is well-settled that a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, and the doctrine of harmless error does not apply." *Guzman,* 80 F.3d at 776 (citing, *inter alia, Waller,* 467 U.S. at 49–50 & n. 9, 104 S.Ct. at 2217 & n. 9; *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994)). Petitioner is thus entitled to habeas corpus relief for violation of his right to a public trial. The form of that relief will be discussed after review of petitioner's remaining grounds of relief.

### B. Precluded Cross–Examination

The Confrontation Clause of the Sixth Amendment "provides two types of

protection for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Id.* (citation omitted). In short, the Confrontation Clause guarantees "an *opportunity* for effective cross-examination." *Id.* at 53, 107 S.Ct. at 999 (citation omitted) (emphasis in the original). However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

Petitioner argues that he was denied an opportunity for effective cross-examination of D.M. because he was precluded from presenting questions concerning the *Bolivar* action, the earlier sexual assault case in which D.M. was involved. Petitioner offers a number of different theories as to how the trial court's restrictions interfered with his cross-examination rights. These theories are discussed separately below.

### 1. Inability to Show Bias Based on Acquittal in *Bolivar*

 The jury in *Bolivar* returned a verdict of not guilty. Petitioner argues that the timing of this acquittal provides a reason to suspect bias in D.M.'s testimony in the subsequent *Kelly* case. The incident at issue in *Kelly* occurred on April 2, 1985. In her initial complaint to the police, D.M. stated that Mr. Kelly forced her into her car, took $10 from her, and forced her to drive around New Haven until she managed to jump out of the car. The week after this incident, D.M. testified in the *Bolivar* case. On April 19, 1985, the *Bolivar* jury returned a not guilty verdict. Only after this acquittal did D.M. inform the police that during the April 2 abduction Mr. Kelly forced her to perform fellatio.

Although defense counsel was permitted extensive cross-examination concerning the change in D.M.'s story, defense counsel was not allowed to link the changed story to the Bolivar acquittal. D.M. testified that she had originally neglected to inform the police of the oral sex because she was "afraid and embarrassed." (Trial Transcript, III–197.) Petitioner suggests, however, that D.M. was merely embellishing her story so as to reduce the risk of experiencing a second "humiliation" in the form of another acquittal. Petitioner argues that the fact that D.M. changed her story after the acquittal indicates that she was biased and willing to say anything to insure the conviction of Mr. Kelly.

Petitioner further notes that D.M. did not initially tell police that she had been permitted to telephone her boyfriend during the time of the alleged abduction. However, it is unclear how this fact constitutes an "embellishment" that would indicate a bias against Mr. Kelly. If anything, this fact seems favorable to Mr. Kelly.

For a number of reasons, the Court finds petitioner's theory, though creative, wholly unpersuasive. First, Mr. Kelly was not charged with the alleged forced oral sex, and D.M. only testified to it under cross-examination. Thus, even if the jury could be persuaded that the oral sex was a fabricated embellishment, the fact of this embellishment would have no direct relevance to the jury's determination of petitioner's guilt with respect to the crimes for which he was actually charged and convicted.

Moreover, petitioner's theory that the first acquittal resulted in a desire on D.M.'s part to embellish her story in order to secure a conviction of Mr. Kelly seems highly speculative. It seems just as plausible, if not more so, that the lesson D.M. learned from the first trial, where she had also been cross examined on later-reported details of the alleged crime, was the value of telling the police all of the details of a case, no matter how embarrassing, before trial.

Petitioner argues that D.M. sought personal "vindication" in the second case; however, a complaining witness always seeks vindica-

tion of sorts when he or she takes the witness stand. Petitioner has provided the Court with no basis to presume that the fact of an earlier acquittal tends to render a complaining witness's testimony significantly more biased than usual.

The Confrontation Clause does not guarantee unlimited cross-examination in support of any theory of bias or improper motive that a defendant may offer. *Delaware v. Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435. Rather, the Sixth Amendment protects effective, relevant cross-examination; to be within the ambit of the Confrontation Clause, evidence as to motive must be strong enough that a jury could reasonably find the witness to be inappropriately biased. *Id.* In light of the weakness of Mr. Kelly's motive theory, the Court cannot conclude that the trial court committed constitutional error by preventing the theory from being presented to the jury.

Even if preclusion of the date of the Bolivar acquittal were found to be constitutional error, the Court would conclude that the error was harmless under the standards for harmless error articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under *Brecht*, the Court is required to examine the record of the trial as a whole to determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623, 113 S.Ct. at 1714. At trial, defense counsel was permitted two days of cross-examination of D.M., in which numerous gaps, inconsistencies, and omissions in her various statements were highlighted for the jury. *See Kelly*, 208 Conn. at 380, 545 A.2d 1048. The petitioner argues that there was injurious effect in not being able to present to the jury a motive for the changes in D.M.'s story, i.e., the desire for personal vindication after the Bolivar acquittal. However, given the speculative nature of this theory, as well as its questionable relevance, the Court cannot conclude that knowledge of the date of acquittal would have had a substantial influence on the jury.

Moreover, although there is no corroborating evidence as to the oral sex allegation, the jury did receive corroboration as to actions for which Mr. Kelly was actually charged and convicted. Whether a constitutional error as to cross-examination is harmless depends in part on such factors as "the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. In the present case, Ms. Bougourd (the rescuer) corroborated some of D.M.'s testimony as to kidnapping and sexual assault (fondling). Police officers witnessed Mr. Kelly driving D.M.'s car, providing some corroboration for the auto theft charge. D.M.'s boyfriend at Yale witnessed D.M. being driven off in her car. While much of D.M.'s testimony is uncorroborated, the evidence from other sources is strong enough to remove this case from a simple matter of D.M.'s word against Mr. Kelly's. Under *Van Arsdall*, this fact weighs in favor of finding harmless error. In sum, the Court concludes that the failure to permit cross-examination as to the date of the Bolivar acquittal in relation to the "embellishments" of D.M.'s story was, at most, harmless error.

### 2. Inability to Impeach Credibility by Showing False Testimony in *Bolivar*

The petitioner argues that D.M.'s testimony in *Bolivar* was intrinsically implausible and that introduction of that testimony would have been probative as to D.M.'s credibility. The petitioner does not argue that the acquittal in *Bolivar* is probative per se. Because Mr. Bolivar offered an alibi defense, it is impossible to tell from the jury's verdict whether the jury disbelieved that D.M. had been assaulted as she claimed or whether the jury simply disbelieved that Mr. Bolivar had done it. *Kelly*, 208 Conn. at 376–77, 545 A.2d 1048. However, petitioner argues that the real issue in *Bolivar* was not the identification of Mr. Bolivar or the alibi he offered, but

the difficulty in believing that D.M. had received the sorts of wounds she sustained in the course of the violent struggle she described. In making this argument, the petitioner is handicapped by the fact that he has not been permitted access to the transcript of the *Bolivar* case; his claims concerning the nature of D.M.'s testimony are based upon a post-conviction conversation between his counsel and Mr. Bolivar's attorney.[2]

■ There is no dispute that Mr. Kelly would be entitled to cross-examination as to a proven prior false complaint of sexual assault; however, the State argues that Mr. Kelly has failed to make an adequate showing that the prior complaint was false such that he would be entitled to bring the matter before a jury. The precise standards for such a showing are not entirely clear. *See, e.g.,* 23 Wright & Graham, *Federal Practice & Procedure* § 5387 (1980, Supp.1994) ("[F]ew of the writers [on rape shield laws] have devoted much attention to the question of whether the defendant has a constitutional right to prove that the victim has previously made false accusations of rape."). The parties have not cited, nor has the Court identified, any Second Circuit precedents concerning the initial showing required for admission of a prior false complaint of sexual assault. Looking to cases from other circuits and state cases, the general emphasis is on weighing the probative value of the evidence concerning past charges against the prejudicial effect, with much of the analysis going to the similarity between the earlier and later complaints. *See United States v. Bartlett,* 856 F.2d 1071 (8th Cir.1988); *Hughes v. Raines,* 641 F.2d 790 (9th Cir.1981). One

court has framed the applicable standards as follows:

> [T]he defendant must establish, by a preponderance of the evidence, that (1) the [earlier] accusation or accusations were in fact made; (2) that the accusation or accusations were in fact false; and (3) that the evidence is more probative than prejudicial.

*Miller v. Nevada,* 105 Nev. 497, 779 P.2d 87, 90 (1989). Other cases, while not articulating a preponderance of the evidence standard, share similar concerns. *See, e.g., Hughes,* 641 F.2d at 793 (suggesting that standard is whether "jury reasonably could conclude that the prior charge was false").

Whether the appropriate standard is preponderance of the evidence or reasonable probability, the Court does not believe that petitioner has made an adequate prima facie showing that the *Bolivar* case should have been introduced into evidence as a prior false complaint. Based on an *in camera* review of the testimony in *Bolivar,* the Court cannot conclude with any degree of probability that D.M.'s complaint in the earlier case was false.

Moreover, the Court finds that, even if the *Bolivar* complaint were false, evidence of that prior false complaint would be only minimally probative, while opening up an entire area of evidence totally immaterial to the case on trial. The differences between *Bolivar* and *Kelly* are striking; the similarities superficial. The *Bolivar* case was essentially a case about sexual assault. D.M. alleged that she was pulled into an alley at night and subjected to a brutal, grotesque assault, which involved the insertion of a razor blade into her vagina. Independent corroboration

---

2. Respondent argues that the Court may not properly consider this evidence of the testimony in *Bolivar* because it was not part of the factual record developed in the state-court proceedings, and because petitioner has failed to show cause for his failure to offer this evidence in state court. *See Keeney v. Tamayo–Reyes,* 504 U.S. 1, 7, 9, 112 S.Ct. 1715, 1718–19, 1719–20, 118 L.Ed.2d 318 (1992). Although petitioner may not be *entitled* to introduce fresh facts in this habeas proceeding, respondent forgets that, "In every case, [the district court judge] has the power, constrained only by his [or her] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). *See also Pagan v. Keane,* 984 F.2d 61, 64 (2d Cir.1993). Neither party has offered the Court any reasons as to why it should or should not exercise its discretion, under the standards articulated in *Pagan,* to take cognizance of the *Bolivar* testimony. However, as the analysis below makes clear, the Court does not believe, even taking into account the *Bolivar* testimony, that petitioner is entitled to habeas relief under the theory here considered. Therefore, without conclusively deciding the matter, the Court will proceed as if the *Bolivar* testimony could appropriately be considered in the present petition.

was limited, and the trial was largely a matter of D.M.'s word against the defendant's. By contrast, the heart of the complaint against Mr. Kelly was not sexual assault, but kidnapping, robbery, and larceny. Although sexual assault was involved in the case, its relative unimportance is indicated by the sentences imposed on Mr. Kelly: twenty years on the kidnapping count, ten years on the larceny count, and one year on the sexual assault count. Moreover, the *Kelly* incident occurred in the morning; did not implicate the sorts of grotesque violence alleged in *Bolivar*; and was corroborated in significant ways by other witnesses. Petitioner is correct that both cases involve sexual assaults in New Haven in the vicinity of Yale University, but substantially greater similarity is required to show that the prior complaint was relevant and was required to be admitted in Mr. Kelly's trial.

The Ninth Circuit's decision in *Hughes* is instructive in this regard. In *Hughes*, the complaint included the following allegations: the defendant indicated that he could help the complaining witness get a job with his employer; the complaining witness accepted the defendant's invitation of a ride to meet with his employer; the defendant instead drove the complaining witness to an isolated area and attempted to rape her. At trial, the defendant unsuccessfully sought to introduce evidence that the complaining witness had made a prior complaint of sexual assault against a different defendant, and that the district attorney had declined to prosecute the case. In upholding the trial court's decision, the Ninth Circuit noted the very different factual allegations of the earlier rape complaint: the first incident occurred after a date, when she was in the man's apartment and had consented to some physical contact, and the issue was the extent of her consent. Given the differences between the two complaints, the Ninth Circuit concluded, "Exploring the factual situation of the prior incident would have added extraneous issues that had little, if any, probative value." 641 F.2d at 793. The Court finds that a similar conclusion is appropriate in the present case.

■ In sum, the Court finds no constitutional error in the trial court's preclusion of cross-examination as to the substance of D.M.'s testimony in *Bolivar*. Moreover, even if such preclusion was constitutional error, the Court would find such error harmless under the *Brecht* standard, in light of the dissimilarities between the *Bolivar* and *Kelly* cases, the extensive cross-examination of D.M. that did take place, and the independent corroborating evidence.

### 3. Inability to Impeach Credibility by Showing Pattern of Embellishment

■ Petitioner argues that he was not afforded an adequate opportunity to cross-examine D.M. with respect to the "embellishments" to her story on the eve of trial in the *Bolivar* case. D.M. did not originally report the insertion of the razor blade to the police in *Bolivar*. Petitioner suggests a "pattern of embellishment" when the *Bolivar* addition is coupled with the additions to D.M.'s story in *Kelly*. Petitioner further suggests that this "pattern of embellishment" might have altered the jury's view of D.M.'s credibility.

The essential problem with petitioner's claim is that he was, in fact, permitted to cross-examine with respect to the changes in D.M.'s story in both cases. The cross-examination with respect to the "embellishments" in *Kelly* was quite extensive; the "embellishments" in *Bolivar* received less complete treatment, but were also presented to the jury. (Transcript III–262–63, 305–06.) D.M. admitted before the jury that she had testified in another criminal matter in which there were "gaps or omissions in a formal statement for the police." D.M. further admitted that her statement to the police "did vary" from the testimony she ultimately gave at trial. Thus, the only fact going to "pattern of embellishment" that the jury was not apprised of was that the earlier case also involved allegations of sexual assault. The weight of this added aspect of the alleged pattern of embellishment seems insufficient to produce harmful error by its omission.

Moreover, to the extent that more information about the earlier embellishment is found to be relevant, its relevance would be strongest with respect to the credibility of the alleged embellishments in *Kelly*, i.e., the

claim of forced oral sex. However, as noted above, petitioner was not charged with the oral sex. Even if the jury could have been persuaded that D.M. has a tendency to make up new facts pertaining to sexual assault on the eve of trial, a jury would not necessarily have to conclude that D.M. is any less trustworthy with respect to the claims of robbery, larceny, and kidnapping she made in her initial complaint.

Finally, the Court notes that what petitioner characterizes as a "pattern of embellishment" could just as easily be characterized as follows: in *Bolivar* D.M. initially omitted important facts; at the *Bolivar* trial, just after the incident with Kelly, she was cross-examined extensively on her omissions, and thus learned the importance of providing a complete and accurate police report; consequently, having learned her lesson in the *Bolivar* trial, she sought to provide a more complete story to the police about the *Kelly* incident. In other words, D.M.'s actions may just as easily be characterized as good faith additions to her story as "embellishments."

■■■ In sum, the fact that D.M. changed her story in an earlier sexual assault complaint seems of marginal relevance. Accordingly, the Court cannot conclude that the Confrontation Clause required cross-examination going to petitioner's "pattern of embellishment" theory. Moreover, for the reasons articulated in connection with petitioner's other Confrontation Clause theories, any constitutional error in this regard was clearly harmless.

### 4. Inability to Impeach Credibility by Impugning D.M.'s Explanation for Her Failure to Report Oral Sex

■■■ Petitioner has one final use to which he would like to put the *Bolivar* trial. D.M. testified in *Kelly* that she did not originally tell police about the forced oral sex because of "embarrassment." (Trial Transcript, III–197.) However, when the *Kelly* incident occurred, D.M. was scheduled to testify in just a few days in the *Bolivar* trial. Her testimony in *Bolivar* involved much matter of a highly intimate and degrading nature. Thus, in petitioner's view, D.M.'s claim that she was too embarrassed to tell police about the

fellatio is rather dubious. Petitioner argues that he should have been able to present this issue to the jury, so that the jury could make an adequately informed assessment of D.M.'s credibility.

■■■ The Court finds several weaknesses in petitioner's theory. First, the desired cross-examination bore most directly on D.M.'s credibility in regard to the alleged oral sex. Because petitioner was not charged with this offense, however, the desired cross-examination would have only been relevant to impeach her honesty in a general way. The Confrontation Clause does not necessarily guarantee cross-examination as to a witness's veracity in a matter that is incidental to a conviction. *See Velarde v. United States,* 972 F.2d 826, 830 (7th Cir. 1992) (no Confrontation Clause violation when defendant not permitted to introduce out-of-court statements indicating that witness perjured himself in testimony that was "incidental" to conviction). *Cf. United States v. Piche,* 981 F.2d 706, 714 (4th Cir.1992) ("[O]ne episode of lying does not bear on [a witness's] credibility at [trial] so clearly that it would be an abuse of discretion for the district court to exclude reference to it.").

■■■ Moreover, as noted earlier, petitioner was permitted many other avenues of cross-examination in order to impeach D.M's credibility as a witness. In all, the cross-examination consumed nearly two days and over three hundred pages of the trial transcript. As the Connecticut Supreme Court concluded, "At the trial the defendant conducted an extensive cross-examination of the complainant, developing gaps, inconsistencies and omissions in her various statements." *Kelly,* 208 Conn. at 382, 545 A.2d 1048. Indeed, much of this cross-examination pertained to the changes in D.M.'s story relating to the oral sex, precisely the subject that petitioner now seeks to explore further. However, once counsel is permitted an opportunity to expose a particular basis of impeachment, "it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury. The trial court may preclude 'cumulative and confusing

cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability.'" *United States v. Nelson,* 39 F.3d 705, 708 (7th Cir.1994). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination." *United States v. Taylor,* 17 F.3d 333, 340 (11th Cir.1994). The Court does not find that this standard was violated in the present case. *See United States v. Mizell,* 88 F.3d 288, 294 (5th Cir.1996) (no Confrontation Clause violation when defendant not permitted cross-examination as to witness's motives and inconsistent statements to FBI because "jury had adequate information with which to assess [witness's] credibility"); *United States v. Tarantino,* 846 F.2d 1384, 1406–07 (D.C.Cir. 1988) (no Confrontation Clause violation when defendant not permitted cross-examination as to witness's involvement in murder plot when "defendants took advantage of numerous opportunities to impeach [the witness] in other ways" and cross-examination of the witness took five days and covered nearly 1,000 pages of transcript).

■ Finally, the proposed line of cross-examination, while certainly not helpful to D.M., would not have conclusively belied her explanation of her failure to report the oral sex. Willingness to testify as to one sexual assault does not necessarily alleviate embarrassment as to subsequent assaults. And if proposed cross-examination indicates only a possibility of falsehood as to a collateral element of a witness's testimony, then the Confrontation Clause may not require that cross-examination to be allowed. *See Piche,* 981 F.2d at 714 (because it was "not clear" from defendant's proffer or witness's testimony that witness lied in earlier, unrelated matter, preclusion of cross-examination as to alleged falsehood did not represent constitutional violation).

In this regard, the Court finds important similarities between this case and *United States v. Milikowsky,* 896 F.Supp. 1285 (D.Conn.1994) (Burns, J.), *aff'd.,* 65 F.3d 4, 6 (2d Cir.1995). In *Milikowsky,* the defendants argued that the Confrontation Clause was violated when the trial court precluded evidence that a key witness had originally told prosecutors that he could not remember the dates and locations of meetings that were in furtherance of a price-fixing scheme, although at trial the witness testified as to the exact dates and locations of such meetings. In ruling on the defendants' motion for a new trial, the court noted that a "party may always attack the credibility of an adverse witness by showing that [he or she] has made statements which are inconsistent with some material part of his testimony." *Id.* at 1302 (citation omitted). However, the court refused to grant a new trial for three reasons: 1) the witness's testimony was not sufficiently "inconsistent" with the mere earlier inability to recall details; 2) the defendants "were able to place before the jury sufficient facts and testimony to allow the jury to make an informed decision as to the credibility of [the witness] both generally and specifically on the issue of the [meeting at issue]"; and 3) "any possible error" was harmless. *Id.* Similar conclusions may be reached with respect to petitioner's inability to impeach D.M.'s "embarrassment" testimony.

## C. Limitations on Discovery

■ Lastly, petitioner claims that his constitutional rights were violated by the trial court's decisions not to allow him access to various materials pertaining to the *Bolivar* case and to D.M.'s history of psychiatric care. Petitioner's arguments are appropriately viewed as arising under the Due Process Clause of the Fourteenth Amendment, rather than the Confrontation Clause or the Compulsory Process Clause of the Sixth Amendment. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 54, 56, 107 S.Ct. 989, 999–1000, 1000–01, 94 L.Ed.2d 40 (1987). Under the Fourteenth Amendment, "It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Id.* at 57, 107 S.Ct. at 1001 (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." *Id.* (citation omitted).

■ As to the *Bolivar* materials, the documents at issue were produced for the *in camera* inspection of the trial court. After review, the trial court denied defense counsel access to them. Petitioner now seeks reversal of the trial court's decision, arguing that the trial court adopted too narrow a view of the relevance of the *Bolivar* case. However, in light of the conclusions reached in the foregoing discussion of petitioner's Confrontation Clause claims, the Court cannot conclude that there is a reasonable probability that, had the *Bolivar* material been disclosed to the defense, the result of petitioner's trial would have been different. The trial court made a determination that the requested materials were not relevant to Mr. Kelly's case. After its own review of the *Bolivar* transcripts and prosecutor's file, this Court concurs with the trial court that the *Bolivar* documents were not material; therefore, the government was under no constitutional obligation to disclose them.

■ As to the requested psychiatric records, petitioner suggests that they may be relevant either to contradict specific aspects of D.M.'s testimony in the *Kelly* trial or to raise more general concerns about D.M.'s capacity to comprehend and correctly relate the truth, *see State v. Storlazzi*, 191 Conn. 453, 459, 464 A.2d 829 (1983) ("The linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth").

After an *in camera* inspection, the trial court denied petitioner access to the psychiatric records. This Court has conducted its own *in camera* review of the records, and has simply found no evidence that would directly indicate falsehood in D.M.'s testimony in *Kelly*. As to the broader issues of the complainant's credibility and psychological stability, it is no secret that D.M. received psychiatric counseling as a result of the *Bolivar* incident, that such counseling continued until shortly after the *Kelly* incident, and that D.M. received emergency medical treatment related to psychological crises in March

and November of 1984. *See Kelly*, 208 Conn. at 378, 545 A.2d 1048. However, the Court's review of the records pertaining to the complainant's counseling and medical treatment do not in any way suggest that her ability to "comprehend, know and correctly relate the truth" was impaired such that her report to the police of the *Kelly* incident and her subsequent trial testimony could be cast into doubt.

The cases relied upon by petitioner are easily distinguishable. For instance, although the Second Circuit stated in *Chnapkova v. Koh* that "[a] clinical history of mental illness is probative of the credibility of the witness," the records required to be admitted in that case had established that the plaintiff was paranoid, delusional, and schizophrenic. 985 F.2d 79, 81 (2d Cir.1993). No such clinical diagnoses were made in the present case, and the Court does not believe that *Chnapkova* was intended to require disclosure and admission of all psychiatric records, no matter how tangentially relevant to a witness's capacity to "comprehend, know and correctly relate the truth." Indeed, the Second Circuit elsewhere has indicated that the applicability of the psychotherapist-patient privilege "requires a case-by-case assessment of whether the evidentiary need for the psychiatric history of a witness outweighs the privacy interests of that witness." *In re Doe*, 964 F.2d 1325, 1328–29 (2d Cir.1992).

Nor do the psychiatric records indicate, as petitioner suggests they might, that D.M. was preoccupied that other people would not credit her testimony in the *Bolivar* case; that D.M. had an abnormal fear of strangers, street people, or African–Americans; that D.M. filed a false complaint of sexual assault prior to the *Bolivar* incident; or that the *Bolivar* acquittal provided D.M. with a motive to fabricate in the *Kelly* case.

In short, the Court cannot conclude that there was a reasonable probability that, had the evidence been disclosed to the defense, the result of Mr. Kelly's trial would have been any different. The trial court properly concluded that the psychiatric records, like the *Bolivar* documents, were immaterial, and

thus not constitutionally required to be disclosed.

## IV. Relief

 For the foregoing reasons, the Court finds that petitioner is only entitled to habeas corpus relief as to the closure of his trial. The final issue to be addressed is what form that relief will take. Mr. Kelly is not necessarily entitled to a new trial, for "the remedy should be appropriate to the violation." *Waller*, 467 U.S. at 50, 104 S.Ct. at 2217. Thus, in *Waller*, where a suppression hearing was improperly closed, the Supreme Court ordered only a new suppression hearing, rather than a full trial, unless the new suppression hearing resulted in a material difference as to what evidence was found suppressible. Otherwise, the Supreme Court held, "a new trial would be a windfall for the defendant, and not in the public interest." *Id.*

The Court is persuaded that similar concerns obtain in the present case. The trial court only closed one discrete phase of the courtroom proceedings, i.e., the rape-shield hearing, rather than the trial in its entirety. There is no reason to presume that, if open, the rape-shield hearing would have resulted in materially different decisions by the trial judge as to what evidence could be presented to the jury. Therefore, a new trial for Mr. Kelly might well turn out to be a windfall.

Accordingly, the Court concludes that the relief ordered in *Waller* is appropriate for the present petition. The case is remanded to state court for a new rape-shield hearing. The state court must first decide what portions of the hearing, if any, should be closed to the public. In making this determination, the state court must, of course, comply with the requirements set forth in *Waller*. Moreover, "[t]his decision should be made in light of the conditions at the time of the new hearing, and only interests that still justify closure should be considered." 467 U.S. at 50, 104 S.Ct. at 2217. The state court is particularly urged to take account of the facts that D.M. had previously testified in public during the *Bolivar* trial itself and had also discussed both the *Bolivar* and *Kelly* cases with a reporter, which resulted in a

published article in the *New Haven Register*. *See Kelly*, 208 Conn. at 374, 545 A.2d 1048. Under these circumstances, the Court is dubious that closure of the entire rape-shield hearing may be justified.

After completion of the new rape-shield hearing, a new trial need be held only if the state court arrives at materially different conclusions as to the evidence that may be presented to a jury, or if the new hearing results in "some other material change in the positions of the parties." *Waller*, 467 U.S. at 50, 104 S.Ct. at 2217.

## V. Conclusion

For the foregoing reasons and with the foregoing conditions, a writ of habeas corpus shall issue. The case is remanded to state court for additional proceedings consistent with this opinion to be promptly held.

IT IS SO ORDERED.